THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT FALKNER, Defendant-Appellant.

Second District   No. 77-139

Opinion filed June 15, 1978.

Mary Robinson and Rosetta Hillary, both of State Appellate Defender's Office, of Elgin, for appellant.

Gene L. Armentrout, State's Attorney, of Geneva (Phyllis J. Perko and Martin P. Moltz, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE NASH delivered the opinion of the court:

After trial by jury defendant, Robert Falkner, was convicted of the offense of felony murder (Ill. Rev. Stat. 1975, ch. 38, par. 9—1(a)(3)) and sentenced to a term of 15 to 30 years imprisonment. He appeals

contending that commission by him of the underlying forcible felony alleged in this case, armed robbery, it being a necessary element of the felony murder charge, was not proved beyond a reasonable doubt. He contends that his conviction of felony murder should, therefore, be reduced by this court to the lesser included offense of involuntary manslaughter. Defendant also contends he was denied a fair trial when the State elicited prejudicial testimony from him about a gun which had no relationship to the instant case. We agree that his conviction must be reduced to involuntary manslaughter.

On June 26, 1976, at approximately 10 p.m., defendant entered the bar of the American Legion hall on Kane Street in Aurora. Some 15 to 30 minutes later he ordered two drinks from one of the bartenders, Leo Smith, who served them to him. Shortly thereafter a dispute arose between the two men with defendant contending Smith had shortchanged him. At some point during this dispute defendant pulled a revolver and demanded that Smith give him more money. While defendant was brandishing the revolver he was grabbed by one or more patrons of the bar and a struggle ensued during which the deceased, George Bell, who held defendant's gun arm, was shot and killed. Two or three shots were fired as defendant was forced to the floor and a bullet also struck Corrine Ford in her ankle. Defendant left the hall and subsequently turned himself in to the Aurora police on June 29. He was indicted in separate counts for aggravated battery in the shooting of Corrine Ford, armed robbery of Leo Smith and felony murder in causing the death of George Bell while committing the armed robbery of Smith. (Ill. Rev. Stat. 1975, ch. 38, pars. 12—4, 18—2, 9—1(a)(3).) At trial the aggravated battery count was nol-prossed and the jury returned verdicts of guilty to the armed robbery and felony murder counts and to the offense of involuntary manslaughter (Ill. Rev. Stat. 1975, ch. 38, par. 9—3(a)) upon which it was also instructed. Judgments were initially entered on all three verdicts but the judgments entered on the armed robbery and involuntary manslaughter verdicts were ultimately vacated and defendant was sentenced only on the felony murder conviction.

■■ The State is required to prove beyond a reasonable doubt each of the essential elements necessary to constitute the crime charged. (*People v. Stone* (1973), 15 Ill. App. 3d 926, 928, 305 N.E.2d 645, 646.) The offense of felony murder is defined as follows: "A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death: * * * (3) He is attempting or committing a forcible felony other than voluntary manslaughter." (Ill. Rev. Stat. 1975, ch. 38, par. 9—1(a)(3).) Proof that an accused was attempting or committing a forcible felony other than voluntary manslaughter is an essential element of felony murder under this definition. Defendant was

charged with having committed felony murder in that he caused the death of George Bell while committing an armed robbery of Leo Smith; it was necessary, therefore, that the State prove each of the essential elements of the offense of armed robbery. "A person commits robbery when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force" (Ill. Rev. Stat. 1975, ch. 38, par. 18—1(a)), and "[a] person commits armed robbery when he [commits robbery] while armed with a dangerous weapon" (Ill. Rev. Stat. 1975, ch. 38, par. 18—2(a)). In the recent case of *People v. White* (1977), 67 Ill. 2d 107, 365 N.E.2d 337, our supreme court held that the intent to deprive the person from whom the property is taken permanently of its use or benefit is an element of the crimes of robbery and armed robbery, thereby overruling a previous line of authority to the contrary (see, *e.g.*, *People v. White* (1976), 40 Ill. App. 3d 455, 352 N.E.2d 243, and cases cited therein).

Defendant contends that under the evidence here it is clear his taking of money from Smith at gunpoint was not done with the intent to rob him but rather was a reckless attempt to stop Smith from interfering with defendant's own property by shortchanging him. He asserts the requisite intent element of armed robbery was not present and, therefore, neither was the underlying forcible felony element of the felony murder charge. Conceding that his conduct in using a gun to prevent being shortchanged was certainly reckless, defendant asks that his conviction of felony murder be reduced by this court to involuntary manslaughter.

■■ Since an intent to permanently deprive an owner of his property can seldom be proved by direct evidence it has been held that such intent may be deduced, or inferred, by the jury from acts committed and circumstances in evidence. (*People v. Baddeley* (1969), 106 Ill. App. 2d 154, 158, 245 N.E.2d 593, 595.) While questions of credibility and weight are for the jury, and we do not lightly take the step of reversing a jury's determination of guilt, it is nevertheless the duty of a court of review to carefully review the evidence, and if it is not sufficient to remove all reasonable doubt of the guilt of the defendant and to create an abiding conviction that he is guilty, the conviction will be reversed. *People v. Hister* (1975), 60 Ill. 2d 567, 573, 328 N.E.2d 531, 534.

Defendant, the bartender, Leo Smith, and several other persons present in the barroom, testified at trial as to their recollections of what transpired between defendant and Smith immediately prior to the production of the gun. Smith, called by the prosecution, stated defendant first gave him a $1 bill to pay for $1.50 worth of drinks and, after Smith informed him that was not enough, defendant gave him a $20 bill and Smith returned him $18.50 in change. Defendant then stated his change was incorrect claiming he had given Smith a $50 bill. Smith told defendant he was mistaken as

there was not a $50 bill in his cash register whereupon defendant pulled a gun saying, " 'Give me my money, give me all the money.' " Smith stated he than gave defendant $30 more and defendant again said " 'Give me all of it.' " Smith then gave defendant a number of $10 bills which defendant put in his pocket. As defendant tried to leave the scuffle in which George Bell was killed ensued.

Defendant testified that he had worked as a welder in a factory for the past 10 years and earned $7 an hour. His weekly take home pay was about $212, although he put $75 into savings each week, and he had last been paid on the day before the incident in question. He stated he had cashed his 1975 Federal income tax refund check during the week before the shootings and on the night of the shootings he was carrying over $500 on his person, including quite a few $50 bills. He stated that because he was carrying a substantial sum of money, had been robbed twice before, and had recently been having some problems at the legion hall, he had decided to carry a gun on the evening of the events in question. Defendant testified he paid for the drinks he ordered with a $50 bill whereupon he noticed he had been shortchanged by Smith. He told Smith he had given him a $50 bill and Smith told defendant he did not owe him any change and walked away. Defendant told Smith a couple of times that he owed him $30 but was ignored. Defendant then stated to Smith, " 'You owe me $30; give me my money,' " pulled his gun and again stated, " 'Give me my money.' " Smith then gave him only $10 and defendant stated, " 'Give me all of my god-damn money.' " Smith laid a couple more bills on the bar; defendant presumed they were the rest of his change, put them in his pocket and had started to leave when patrons grabbed him and the shooting occurred.

The pertinent testimony of the other witnesses called by the State in this regard was as follows:

Robert Waldsmith stated that he observed defendant give Smith a $20 bill to pay for some drinks. After receiving change, defendant claimed he had given Smith a $50 bill and had been shortchanged and said he wanted "all his change back." Smith told defendant he did not owe him any change and defendant pulled a gun and demanded that Smith "give him all the [m.f.] money." Smith then took a "whole bunch of money" from the cash register and gave it to defendant who put it in his pocket and started to leave.

Floyd Robinson testified he observed defendant holding a gun on Smith and heard him say to Smith that he had given him a $50 bill and that Smith owed him $30 stating, " 'Leo, give me my money, don't you know I'll kill you?' " Smith then gave defendant an undetermined amount of money and defendant stated " 'Give me all the money.' " Smith gave

defendant some more money which he put in his pocket and then defendant was grabbed by someone and the shooting occurred.

L. C. Hope stated he heard an argument at the bar and when he looked up he observed defendant holding a gun and telling the bartender to " 'Give me my m.f. money.' " The bartender then gave defendant some money and defendant stated " 'Give me all the m.f. money.' " Hope left the room as the bartender gave defendant some more money.

Corrine Ford, who was wounded by one of the shots from defendant's gun, testified she heard defendant say he had been shortchanged. He demanded money from the bartender who gave him some and defendant "kept on demanding money, and [Smith] just kept giving him money." She did not know the amount in dispute or the amount which Smith gave defendant.

Early Vaughn testified that he saw defendant holding a gun and heard him direct Smith to " 'Give me all my money.' "

Odelle Poole, called by the defense, testified that he saw defendant take a $50 bill from a large roll of bills and hand it to Smith to pay for his drinks. Defendant claimed he had been shortchanged but Smith denied it. Defendant then asked Smith two or three times to " 'Give me the right amount of money,' " but was ignored. At this point defendant pulled a gun and told Smith to "give him all his money." Smith then took one bill from the cash register and gave it to defendant. Defendant again told Smith to "give him all his money" and Smith gave him two more bills. Defendant took this money and started to leave. Poole did not know the denomination of the bills which were given to defendant.

Katherine Smith, a niece of Leo Smith, also called by the defense, stated she saw defendant served some drinks and thereafter saw him pull a gun and heard him tell Leo Smith to " 'Give me the rest of my m.f. money.' " Leo Smith then gave defendant three $10 bills and at that point someone grabbed him and the resulting struggle ensued.

In rebuttal, Evans Neal was called by the State and testified that in April or May of 1976 he was collecting cover charges at the door of the legion hall when defendant entered and gave Neal a $20 bill to pay the $2 cover charge. Neal gave defendant $18 in change whereupon defendant claimed he had given Neal a $50 bill. A companion of Neal told defendant he had only given Neal a $20 bill. Neal then returned defendant's $20 bill, defendant returned the $18 to Neal and defendant left.

■■ As we view it, this evidence does not establish beyond a reasonable doubt that defendant possessed an intention to rob Leo Smith. In *People v. Baddeley* (1969), 106 Ill. App. 2d 154, 245 N.E.2d 593, defendant, an automobile repairman, had taken possession of another's auto under the mistaken, albeit honest, belief that he had a right as a lienholder to do so

and was convicted of theft. The appellate court reversed his conviction holding that the intent to permanently deprive the owner of the auto of his property was not proved beyond a reasonable doubt. The following analysis by the court is particularly relevant to our case:

> "Although an intent to steal may ordinarily be inferred when a person takes the property of another, proof of the existence of a state of mind incompatible with an intent to steal precludes a finding of theft. 25 ILP, Larceny, §7. It has long been the rule in many states throughout the country that a bona fide belief, even though mistakenly held, that one has a right or claim to another's property, negates an intent to deprive the owner permanently of his property. (See collected cases in 46 ALR2d 1227 (1956).)" (*Baddeley*, at 158-59, 245 N.E.2d 593, 595; see *Richardson v. United States* (3d Cir. 1968), 403 F.2d 574 (lack of intent to commit robbery); *People v. Steinmann* (1978), 57 Ill. App. 3d 887, 892-93, 373 N.E.2d 757, 760-61 (lack of intent to commit theft).)

In the instant case defendant was in a place where he was known and carrying a substantial sum of his own money when the alleged armed robbery occurred. While the evidence was conflicting as to whether defendant gave the bartender a $50 or a $20 bill in payment for the drinks, a conclusion by the fact-finder that it was only a twenty would not establish defendant intended to rob the bartender. It would be equally probable to conclude defendant was confused or mistaken as to the denomination of the bill and intended only to recover his correct change as he and other witnesses testified. A factual determination of the denomination of the bill, alone, cannot in these circumstances establish defendant's intent. All the witnesses testified that defendant initially asked for his own money. Those persons who heard him ask for money a second time differed as to whether he then demanded "all the money" or "all my money." Even if defendant in fact requested "all the money" on the second occasion this could have referred to all the money that was rightfully his if he thought he still had not received proper change. There was evidence that on a prior occasion in the same place defendant claimed to have given a $50 bill to a person collecting cover charge when he had in reality only given a twenty. While such evidence might suggest that defendant practiced a scheme to defraud persons changing bills for him, it also might be said that such evidence showed that on another occasion when defendant realized he had made an error he peacefully accepted it and left. The evidence here leaves us with a grave doubt as to defendant's intent to commit armed robbery and, therefore, we must find that the necessary armed robbery element of the felony murder charge was not proved beyond a reasonable doubt.

The State argues sufficient proof of the intent element necessary to support defendant's conviction of felony murder was provided by certain testimony at trial that after defendant was grabbed by George Bell as he started to turn away from the bar he then purposely pointed his gun at Bell and shot and killed him. We note that the evidence in this regard was conflicting and it is not clear whether the shot which killed Bell was fired purposely or accidentally during the struggle. However, that would have been a question for the jury had the State charged defendant with intentional murder under sections 9—1(a)(1) or 9—1(a)(2) of the Criminal Code rather than only pursuant to the felony murder provisions of 9—1(a)(3). (Ill. Rev. Stat. 1975, ch. 38, par. 9—1.) As no such charges were brought that question is not before us. In any event, the unique characteristic of the elements of felony murder is that they do not include an intent to take life (*People v. Davies* (1977), 50 Ill. App. 3d 506, 511, 365 N.E.2d 628, 632), and evidence that such an intent existed here would not supply the intent to commit armed robbery which we find necessary and lacking in this case.

■■ Defendant's action in pulling a loaded gun in a crowded bar to force the bartender to return his correct change was reckless and likely to cause death or great bodily harm to some individual and it did so. (See *People v. Thomas* (1972), 8 Ill. App. 3d 690, 693, 290 N.E.2d 418, 420.) Therefore, pursuant to Supreme Court Rule 615(b)(3) (Ill. Rev. Stat. 1975, ch. 110A, par. 615(b)(3)) we exercise our power to reduce the degree of the offense of which defendant was convicted, felony murder, to involuntary manslaughter (Ill. Rev. Stat. 1975, ch. 38, par. 9—3), a lesser included offense (*People v. Golden* (1975), 29 Ill. App. 3d 502, 507, 331 N.E.2d 134, 138).

Defendant further contends he was denied a fair trial when the State elicited prejudicial testimony about a gun, which had been found in his car on another occasion unrelated to the instant case, and also commented on that gun in closing argument.

On direct examination, defendant stated he had carried a gun on the night in question because he was carrying a large amount of money, he had previously been robbed twice in Chicago and he had recently had some undisclosed problems at the legion hall. On cross-examination the prosecutor inquired whether defendant had ever carried a gun before and defendant stated, "No, not really." Defendant was then asked whether he had carried a gun on April 3, 1976. Defense counsel objected to the question, but before the trial court could make a ruling defendant stated that he had not carried a gun on that date and the objection was withdrawn. The prosecutor then asked defendant whether a gun was found in his car on that day and he replied that one had been. During his

closing arguments the prosecutor commented that defendant had almost forgotten to tell the jury that he was found with a gun in his car on April 3, 1976, until reminded by him in cross-examination.

■■ Recognizing that he has waived consideration of these alleged trial errors by failing to raise them in his post-trial motion (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856) defendant argues we should consider them under the plain error rule (Ill. Rev. Stat. 1975, ch. 110A, par. 615(a)). We do not believe plain error is involved here and we need not consider these contentions. In any event, it is well established that the State has a right to cross-examine a defendant on matters raised in his direct testimony (*People v. Stevens* (1976), 40 Ill. App. 3d 303, 306-07, 352 N.E.2d 352, 355) in an attempt to explain, modify, discredit or contradict the direct testimony (*People v. Miller* (1976), 39 Ill. App. 3d 714, 717, 349 N.E.2d 103, 106). Here the questions complained of concerned defendant's practice of carrying a gun, a matter first brought out by defendant on direct examination, and the trial court properly permitted cross-examination thereon. (See *People v. Clark* (1973), 9 Ill. App. 3d 998, 1003-04, 293 N.E.2d 666, 669-70.) *People v. Wade* (1977), 51 Ill. App. 3d 721, 366 N.E.2d 528, and *People v. Hellemeyer* (1975), 28 Ill. App. 3d 491, 328 N.E.2d 626, relied upon by defendant, may be distinguished because in those cases the matter of weapons unrelated to the offenses charged was first brought out by the State. Since the cross-examination was proper the comment upon the testimony of the defendant by the prosecutor during his closing argument was permissible as it was based on facts in evidence. *People v. Oliger* (1975), 32 Ill. App. 3d 889, 893, 336 N.E.2d 769, 772.

For the reasons stated above, the judgment of conviction of felony murder is reduced to a judgment of conviction of involuntary manslaughter and the sentence imposed on the felony murder charge is vacated. The cause is remanded to the trial court with directions to resentence defendant on the modified judgment of conviction of involuntary manslaughter. See *People v. O'Neal* (1977), 50 Ill. App. 3d 900, 907, 365 N.E.2d 1333, 1339.

Judgment of conviction affirmed as modified, sentence vacated and cause remanded with directions.

SEIDENFELD, P. J., and GUILD, J., concur.