# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Day*, 2011 IL App (2d) 091358

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANN M. DAY, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-09-1358 |
| Filed | August 30, 2011 |
| Modified upon denial of rehearing | October 27, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for theft and forgery based on her taking of money from the real estate law firm she started with a partner were upheld where the evidence was sufficient to sustain her felony convictions and support the finding that she intended to permanently deprive the firm and her partner of the funds, the restitution order was statutorily authorized, and the trial court did not err in setting the restitution payments without considering defendant's ability to pay. |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 05-CF-430; the Hon. Timothy Q. Sheldon, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Alan D. Goldberg and Deepa Punjabi, both of State Appellate Defender's Office, of Chicago, for appellant.

Joseph H. McMahon, State's Attorney, of St. Charles (Lawrence M. Bauer and Barry W. Jacobs, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

PRESIDING JUSTICE JORGENSEN delivered the judgment of the court, with opinion.

Justices Burke and Birkett concurred in the judgment and opinion.

## OPINION

¶ 1    Following a bench trial, defendant, Ann M. Day, was convicted of 10 counts of theft (720 ILCS 5/16-1(a)(1), (a)(2) (West 2004)) and 16 counts of forgery (720 ILCS 5/17-3(a)(1), (a)(2) (West 2004)). She was sentenced to 48 months' probation and 180 days in jail (with credit for 64 days served) and ordered to pay $137,937.27 in restitution (in $2,873 monthly installments) to Karen Tietz, her former law partner. The trial court denied defendant's motion to reconsider the sentence. Defendant appeals, arguing that: (1) the evidence was insufficient to sustain the four Class 1 felony theft convictions; (2) the evidence was insufficient to support the finding that she intended to permanently deprive her firm and Tietz of any wrongfully taken funds; (3) the restitution amount was not statutorily authorized and, therefore, is void; and (4) the trial court abused its discretion in ordering her to make monthly $2,837 restitution payments without considering her ability to pay. We affirm.

¶ 2                                   I. BACKGROUND

¶ 3    On November 1, 2005, defendant was charged with 12 counts of theft and 18 counts of forgery. Trial commenced on May 11, 2009. The State's theory of the case was that defendant and Tietz started a real estate law firm together and that, in the course of their practice (from March to November 2004), defendant stole $137,937.27 from the firm and Tietz. Defendant's defense was that she was entitled to some of the money, and she attempted to show that there was no evidence of each partner's rightful net share and, therefore, of how much was wrongfully taken. She argued that the evidence was unclear as to whether the partners had agreed that they would equally split firm proceeds or that 85% would go to defendant in the first year because she was the more experienced real estate attorney.

¶ 4    Tietz testified as follows. In late 2003, Tietz and defendant met through their church and

defendant asked Tietz if she wanted to open a law practice with her. Tietz agreed, and, in December 2003, they opened Day & Tietz P.C., which was organized as a professional service corporation (see 805 ILCS 10/1 *et seq.* (West 2004)) in St. Charles. The partners discussed the division of profits and, according to Tietz, decided to equally split them; this was an oral agreement. Addressing a "Preliminary Firm Plan" that defendant created, Tietz explained that its purpose was to attempt to gain their church as a firm client; that is, it constituted merely a "sale pitch" to the church and not the partners' agreement as to how they would run the firm. Tietz explained that the plan was only two pages in length, was never filed with the Secretary of State, and was created merely as a marketing tool in an attempt to gain the partners' church as a firm client. However, a four-page version of the plan was also admitted at trial, and it referenced that, during 2004, defendant would receive 85% of the firm's net proceeds and Tietz would receive 15%. Neither the two-page nor the four-page document was signed.

¶ 5    Tietz further testified that defendant had an ongoing practice when they formed their firm but defendant desired more income. The partners decided that, as to defendant's existing clients, defendant would keep the proceeds from the legal work she was performing for them. There were about five such clients. Tietz testified that the last of these business relationships, which pertained to real estate transactions such as closings, would have ended by February or March 2004 given the nature of the transactions.

¶ 6    Within six months of forming the firm, Tietz and defendant were "busy" representing clients in buying or selling real estate. Generally, if they represented a buyer, the buyer would directly pay the firm. When they represented a seller, the firm's fees came from the title company. The firm placed the fees into its business operating account, which was held at Benchmark Bank. They also held there a client trust account to hold client money to which the firm was not entitled. The trust account held, for example, earnest money that a buyer posted; the firm would present a check for that money to the title company at closing. Tietz explained that there would be no reason for a firm attorney to write a check to herself out of the trust account (or the business operating account) for an earnest money reimbursement.

¶ 7    When the firm was first formed, defendant and Tietz did not receive any compensation for their services. However, in March 2004, defendant informed Tietz that defendant's husband was no longer working and had heart problems and that defendant now needed income. The partners agreed that defendant could draw a paycheck (through Paychex, a payroll service). Later, in about May or June, Tietz also began receiving a paycheck from the firm. When defendant began receiving paychecks from the firm, there were sufficient funds in the firm's account to pay her. At this time, Tietz attended real estate closings. When she received a check from the title company, she gave it to defendant to deposit into the business operating account. In the beginning, defendant did so.

¶ 8    On May 5, 2004, the firm hired a paralegal secretary, Mary Watts. She received a paycheck through Paychex. Watts prepared closing documents, paid the firm's bills, and created files. Before Watts was hired, defendant wrote checks for the firm. The business operating account was set up so that either partner was an authorized signer on the account; that is, two signatures were not required on the firm's checks. During this time, Tietz did not review the firm's bank statements.

¶ 9     In October or November 2004, Tietz became concerned about the firm's finances because she discovered that a check purportedly issued to a plumber was not submitted to the firm's landlord for reimbursement. Defendant told Tietz not to worry about it. Tietz remained concerned because the firm's account balance was low. Also, she was unable to find a plumbing company with the name specified in the checkbook register; the handwriting in the register was defendant's writing. The actual check (No. 1215), Tietz discovered, was not made out to a plumbing company, but was made out to defendant, in the amount of $1,250, and the check was signed by defendant. The day on which she discovered the actual check was the last day the partners operated the firm together. Over the weekend that followed, Tietz approached the police and made her initial complaint.

¶ 10    Tietz subsequently reviewed the firm's financial records. Addressing one general category of the over 120 exhibits admitted into evidence, Tietz testified that each exhibit consisted of a check, from a firm client (a buyer) or a title company, that purported to contain fees due to the firm for work it had performed. Further, each such exhibit included a deposit slip and a bank statement from defendant's personal business account at Old Second Bank reflecting that the funds were deposited into defendant's account and not into the firm's account. However, with respect to nine of these exhibits, which consisted of checks from title companies, Tietz testified that those checks likely belonged to defendant because they were issued in January and February 2004, when defendant was likely still working on her preexisting client files. Tietz could specify neither defendant's preexisting clients nor how much income was due defendant for the work she performed for these clients.

¶ 11    As to certain other exhibits (Nos. 31, 102, and 104 through 108), Tietz testified that the checks were made payable to the firm and that they contained both defendant's and, purportedly, Tietz's endorsements. There were also corresponding deposit slips and bank statements reflecting that the funds in these checks were deposited into defendant's personal business account at Old Second Bank. Tietz denied signing these checks over to defendant and testified that Tietz's endorsements on these checks were in defendant's handwriting.

¶ 12    Exhibit No. 64, a $1,500 check payable to Dorothy Sokolowski, a firm client, contained Sokolowski's endorsement on the back; underneath Sokolowski's endorsement was defendant's endorsement. The parties stipulated that, if called, Sokolowski would testify that she did not endorse the check. The exhibit also contained a deposit slip and a bank statement that reflected that the check was deposited into defendant's account. The check was drawn from the firm's business operating account. Tietz testified that, if any monies were due this client, they would have come out of the firm's trust account. The firm's practice was not to issue client monies out of its business operating account.

¶ 13    The second general category of exhibits admitted at trial consisted of checks that were generally payable to defendant and written out of either the firm's operating account or its trust account. A corresponding check ledger entry was attached, showing a discrepancy between each check and the ledger entry. Tietz further identified several checks that defendant wrote to herself out of the operating account, for an "escrow payment" or "earnest money reimbursement." Tietz explained that the firm did not hold client earnest money in the operating account and did not advance money from their own personal funds for these purposes.

-4-

¶ 14 Addressing exhibit No. 45, a $3,500 check defendant wrote to herself on June 12, 2004 (and deposited into her personal business account on June 14, 2004) from the firm's account, Tietz testified that this amount was in addition to the Paychex checks defendant was receiving and that she could not recall if the partners discussed whether defendant could take this draw. Tietz explained that the partners' agreement was that defendant could take only salary payments (via the Paychex checks), not draws. Tietz conceded that, at the time, the partners discussed that defendant's real estate taxes were overdue and that defendant needed assistance in paying them. Tietz could not recall if exhibit No. 45 represented a draw to pay the taxes, and she stated that another check was used to pay at least some of the taxes. Generally, Tietz was not concerned about the paychecks defendant was receiving, because she assumed that they would eventually "square up."

¶ 15 On cross-examination, Tietz testified that she did not review defendant's client list before they formed the firm. Tietz would take draws from the firm as money came into the firm. She believed there would be time to catch up to defendant's draws. Tietz's understanding was that, if any of defendant's preexisting clients subsequently hired the firm to perform work, the partners would spilt the proceeds if the fees were for more than a nominal amount. Tietz conceded that "proceeds" refers to gross sales and is distinct from profits. Tietz testified that no clients lost money as a result of any funds defendant took from the firm's client trust account. According to Tietz, clients were paid because defendant used funds from the firm's business operating account to replenish the firm's client trust account.

¶ 16 Watts testified that she worked for the firm as a legal secretary and paralegal. She performed recordkeeping duties for the firm, including creating deposit slips and ensuring that deposits were made. When she received checks to deposit, Watts did not verify them with the title companies or reconcile them with the Housing and Urban Development statements from the closings. Thus, if, for example, four checks were issued and the attorney kept two, Watts would not have been aware that she was not given all checks to deposit into the firm's account.

¶ 17 At some point, Benchmark Bank contacted Watts to notify her that the firm's client trust account had a $6,000 deficiency. Watts informed defendant of the problem, and defendant told her to transfer monies from the firm's business operating account to cover the deficiency. According to Watts, defendant also instructed her not to inform Tietz of the deficiency.

¶ 18 In September, Watts was unable to reconcile the business operating account statement with the firm's Quickbooks accounting program. The statement showed $6,000 in earnest money returns that should not have come out of that account. Watts printed out reconciliation reports to give to defendant and Tietz. Watts explained to defendant the purpose of the reports, and defendant took both copies and ripped up Tietz's copy, stating that there was no need for it.

¶ 19 Addressing new clients to the firm, Watts testified that "we would just kind of divvy them up equally." Both defendant and Tietz had authority to sign firm checks. It was not common for Tietz to write a check. It was common for defendant to write checks out of the firm's business operating account.

¶ 20 The defense called Donna Slemp, a real estate broker who knew defendant through a mutual real estate client. Slemp testified that she was present at the firm's office on July 30, 2004, to pick up a check. Tietz was also present. After about five minutes, defendant returned from real estate closings and presented checks from the closings that needed to be signed. Slemp testified that she heard Tietz say to defendant: "[g]o ahead, just sign them all, deposit them. They're all yours, anyway." Slemp is a friend of defendant's and is also her landlord. Defendant did not testify.

¶ 21 On September 30, 2009, in a 31-page order, the trial court found defendant guilty of 10 counts of theft and 16 counts of forgery. On December 9, 2009, the court sentenced defendant to 180 days in the Kane County jail (with credit for 64 days served) and 4 years' probation. The court also ordered defendant to pay $137,937.23 in restitution to Tietz in $2,873 monthly installments.[1] Subsequently, the court denied defendant's motions for a new trial and to reconsider the sentence.[2] Defendant appeals.

¶ 22                                     II. ANALYSIS
¶ 23                          A. Sufficiency of the Evidence
¶ 24                       1. Value of Wrongfully Taken Funds

¶ 25 Defendant argues first that her four convictions of Class 1 felony theft should be reversed. In counts I and III, the State alleged that defendant committed theft of currency (in excess of $100,000 but not exceeding $500,000) belonging to the firm, and in counts II and IV, it alleged that defendant committed theft of currency belonging to Tietz. Defendant argues that the evidence was insufficient to show the value of the wrongfully taken funds, because the court failed to calculate and subtract from its value assessment her share of any firm profits. She contends that there was no evidence of gross sales and expenses and, therefore, no evidence of each partner's rightful net share. Thus, in her view, the State did not establish the amount of Tietz's losses (after subtracting defendant's share) or that they amounted to more than $100,000 (the threshold for Class 1 felony theft). Defendant requests that we reverse her convictions or, alternatively, reduce the convictions to misdemeanor theft of under $300. For the following reasons, we reject defendant's argument.

¶ 26 When we review a challenge to the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Moore*, 375 Ill. App. 3d 234, 238 (2007). "The reviewing court will not

---

[1]Specifically, on the four Class 1 theft counts, the court sentenced defendant to 48 months' probation and 180 days in jail, and it ordered the restitution. On the six counts of Class 2 theft, the court sentenced defendant to 48 months' probation. On the 16 counts of forgery, the court sentenced defendant to 24 months' probation. Finally, it ordered that all sentences run concurrently.

[2]Via an order entered on January 21, 2010, the supreme court allowed defendant's motion to strike her name from the roll of attorneys licensed to practice law in Illinois. *In re Ann Maureen Day*, M.R. 23573 (2010).

substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses and will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.* Further, the primary rule of statutory construction is to ascertain and give effect to the legislature's intent. *People v. Whitney*, 188 Ill. 2d 91, 97 (1999). The language of the statute must be afforded its plain, ordinary, and popularly understood meaning. *In re Detention of Lieberman*, 201 Ill. 2d 300, 308 (2002). Issues of statutory construction present questions of law, which we review *de novo*. *People v. Caballes*, 221 Ill. 2d 282, 289 (2006).

¶ 27    As to the four Class 1 felony theft counts, the State had to prove that defendant: (1) knowingly obtained or exerted unauthorized control over the firm's or Tietz's property having a value exceeding $100,000 but not exceeding $500,000; or (2) knowingly obtained by deception control over the firm's or Tietz's property having a value exceeding $100,000 but not exceeding $500,000. Further, the State had to prove that defendant intended to permanently deprive the firm or Tietz of the use or benefit of the property. 720 ILCS 5/16-1(a)(1)(A), (a)(2)(A), (b)(6) (West 2004). The value of the property taken is an element of the offense that must be resolved by the trier of fact as either exceeding or not exceeding the specified value. 720 ILCS 5/16-1(c) (West 2004).

¶ 28    Defendant argues that the State failed to prove the value of the property taken, because there was no evidence of the firm's gross sales and expenses and, consequently, no evidence of what each partner's rightful net share should have been. At common law, a partner, for example, could not be convicted of theft or embezzlement of partnership property, because the property had to belong exclusively to another. See, *e.g.*, *People v. Dettmering*, 278 Ill. 580, 587-88 (1917); see also Jane M. Draper, Annotation, *Embezzlement, Larceny, False Pretenses, or Allied Criminal Fraud by a Partner*, 82 A.L.R.3d 822 (1978) (noting that the basis for the common-law rule was that, since partners are treated as joint tenants of the partnership property, the use or appropriation of the partnership's property by a partner for his or her private use is not a criminal act). Defendant concedes that, by statute, a partner can now be found guilty of embezzling partnership property. 720 ILCS 5/16-4(a) (West 2004). However, she argues that it does not follow that, where the property is shared by the defendant and the complainant, the property should be treated as belonging entirely to the complainant or that the defendant's property interest should be entirely disregarded in calculating the value of the property of which the complainant has been wrongfully deprived. As we explain below, we reject defendant's argument because the statute does not require a determination of the parties' interests in assessing the value of the wrongfully taken property.

¶ 29    As to the theft statute, no case has yet addressed the argument defendant presents. The State argues that there is no provision in the theft statute that requires a fact finder to consider an offender's interest in the property when determining the value of the property involved. Further, the State notes that section 16-4(a) of the Criminal Code of 1961 (Code) provides that "[i]t is *no defense* to a charge of theft of property that the offender has an interest therein, when the owner also has an interest to which the offender is not entitled." (Emphasis added.) 720 ILCS 5/16-4(a) (West 2004); see also 720 ILCS 5/16-4(b) (West 2004) (in cases of

spousal property, a theft prosecution may not be maintained unless, at the time of the alleged offense, the parties were not living together as spouses and were living separately). The Committee Comments to section 16-4(a) state that "the provision removes any doubt regarding the commission of theft by a co-owner, such as a partner, joint tenant or tenant in common, or any other type of co-owner who exercises unauthorized control with the intent to permanently deprive such co-owner of his interest in the property." 720 ILCS Ann. 5/16-4(a), Committee Comments-1961, at 289-90 (Smith-Hurd 2003). Thus, the relevant provisions of the theft statute make it clear that a partner, shareholder, or other co-owner claiming an interest in the subject property may be found guilty of theft.

¶ 30    We further conclude that, specifically, as to the value-of-the-property element of theft, the State was not required to prove defendant's interest in the wrongfully taken property. In other words, a partner, shareholder, or other co-owner claiming an interest in the subject property may be found guilty of theft of the full value of the property. Given that, under section 16-4(a), a co-owner may be *found guilty* of theft irrespective of the fact that he or she has an interest in the subject property, we cannot conclude that the fact finder, in calculating the value element of theft, must subtract the co-owner-defendant's interest therein. The statute does not mandate defendant's interpretation, and we decline to read into it this requirement. It remains that the amount wrongfully taken was over $100,000 and not one-half of that amount. To conclude that the value taken was less than that would authorize a co-owner to take funds from a business entity regardless of the co-owner's duties and obligations to the entity. Such a conclusion would, in a sense, eviscerate the business entity. We cannot conclude that the legislature intended such a reading. Corporate law mirrors this conclusion, and we find no reason to interpret the Code any less restrictively. See, *e.g.*, *Sears v. Weissman*, 6 Ill. App. 3d 827, 832 (1972) (where corporate directors made a loan to themselves from the corporation, they were jointly and severally liable to the corporation *for the amount of such loan*); see also 805 ILCS 5/8.65(a)(1) (West 2008) (business corporation act provision stating that corporate directors who vote for or assent to a prohibited distribution are "jointly and severally liable to the corporation *for the amount of such distribution*" (emphasis added)).[3]

¶ 31    Defendant relies on two cases addressing the criminal-damage-to-property statute (720 ILCS 5/21-1(1) (West 2004) ("the extent of the damage is an element of the offense to be resolved by the trier of fact as either exceeding or not exceeding the specified value")), which contains language similar to the theft statute (720 ILCS 5/16-1(c) (West 2004) ("When a charge of theft of property exceeding a specified value is brought, the value of the property involved is an element of the offense to be resolved by the trier of fact as either exceeding or not exceeding the specified value.")). In *People v. Schneider*, 139 Ill. App. 3d 222 (1985), the defendant appealed his conviction of criminal damage to property exceeding $300. He argued that the State did not prove that the damaged property, an automobile in which he asserted he maintained a property interest (along with his former wife), was the property of

_____

[3]In the civil context, although "lawyers are not bound by the same fiduciary duties as those of nonlawyer corporate officers and directors [citation], the principles are similar." *Dowd & Dowd, Ltd. v. Gleason*, 352 Ill. App. 3d 365, 374 (2004).

another under the criminal-damage-to-property statute. The *Schneider* court, assuming *arguendo* that the defendant maintained a property interest in the vehicle, rejected this claim, holding that the statute imposed "criminal responsibility on a person who damages another's interest in property, regardless of whether ownership of the property in question is shared." *Id.* at 224-25. However, the court reversed and remanded the cause so that a jury could consider the defendant's ownership interest in determining the extent of the damage valuation attributable to his former wife's property interest. *Id.* at 225. This finding was determinative of whether the defendant would be guilty of a felony or a misdemeanor. *Id.*; see also *People v. Jones*, 145 Ill. App. 3d 835, 839 (1986) (relying on *Schneider* and holding that, where the defendant was convicted of criminal damage to his estranged wife's vehicle, which was marital property in which he had an interest, the trial court erred in calculating the restitution amount, because it failed to deduct the value of the defendant's interest in the car; cause remanded for a proper evaluation of restitution).

¶ 32    As defendant concedes, *Schneider* and *Jones* involved criminal damage to property and did not address theft. We reject defendant's suggestion that we look to the foregoing cases for guidance in interpreting the theft statute. Each case involved a scenario where a husband and wife arguably co-owned certain property. The theft statute addresses the specific instances in which co-ownership may be used as a defense when one spouse is the defendant and the other is the complainant. See 720 ILCS 5/16-4(b) (West 2004) (in cases of spousal property, a theft prosecution may not be maintained unless, at the time of the alleged offense, the parties were not living together as spouses). Interestingly, in both *Schneider* and *Jones*, the parties were not living together and were either estranged or involved in dissolution proceedings; thus, if a theft had been involved, application of section 16-4(b) would have warranted a different outcome in each case. In any event, the criminal-damage-to-property statute contains no provision analogous to section 16-4(b) and we, therefore, conclude that the cases cited by defendant provide no guidance.

¶ 33    We also reject defendant's reliance on *State v. Debus*, 2002 MT 307, 59 P.3d 1154, which assessed the impact of creditors' claims on shareholders' interests in corporate property after the corporation was dissolved. *Id.* ¶ 32. The *Debus* court set aside the defendant's conviction and held that, because the corporation was dissolved and insolvent on the relevant date, there would have been no leftover funds for the shareholders after the corporation's creditors were paid; therefore, no rational fact finder could have found that the minority shareholders owned the money over which the defendant exercised control. Thus, *Debus* is not on point.

¶ 34    We further find unconvincing defendant's argument that the State failed to establish the income defendant generated from her preexisting clients and, therefore, it failed to prove the precise amount that was wrongfully taken. Specifically, we reject defendant's claim that Tietz's testimony constituted mere speculation. Tietz testified that defendant represented five preexisting clients and that her work for these clients should have been completed by early March 2004. She explained that any real estate transactions, *i.e.*, closings, that would have commenced immediately before they formed the firm would typically have been completed by that time. Critically, Tietz identified checks that were deposited into defendant's personal business account that could have been attributable to these clients, and the trial court

excluded them from its calculation.

¶ 35    Finally, we reject defendant's claim that Tietz's testimony concerning exhibit No. 45, a $3,500 check defendant wrote to herself on June 12, 2004 (and deposited into her personal business account on June 14, 2004), was unclear as to whether the check represented an authorized draw. Defendant asserts that the trial court erred in finding that the check was an unauthorized transaction. Tietz testified that this amount was in addition to the Paychex checks defendant was receiving and that she could not recall if they discussed whether defendant could take this draw. Tietz stated that their agreement was that defendant could take only salary payments (via the Paychex checks), not draws. Although Tietz conceded that, at the time, the parties had discussed that defendant's real estate taxes were overdue and that she needed assistance to pay them, Tietz could not recall if exhibit No. 45 represented a draw to pay the taxes and she stated that another check represented payment of some of the taxes. Based on the foregoing, we cannot conclude that the trial court erred in finding that exhibit No. 45 represented an unauthorized transaction.[4] We further note that, even if the court's finding were erroneous, the evidence was sufficient to show that defendant committed a theft of currency of over $100,000.

¶ 36    In summary, the evidence was sufficient to establish the value of the wrongfully taken funds.

¶ 37                                          2. Intent

¶ 38    Next, defendant argues that her theft convictions should be reversed because the State failed to establish the intent element of theft. For the following reasons, we reject her argument.

¶ 39    The State charged defendant with theft in violation of sections 16-1(a)(1)(A) and 16-1(a)(2)(A) of the Code. Under the first section, the State had to establish that defendant obtained or exerted unauthorized control over Tietz's or the firm's property. 720 ILCS 5/16-1(a)(1) (West 2004). Under the second section, the State was required to prove that defendant obtained by deception control over that property. 720 ILCS 5/16-1(a)(2) (West 2004). Under both types of theft, the State was further required to prove beyond a reasonable doubt that defendant intended to permanently deprive Tietz or the firm of the property (720 ILCS 5/16-1(a)(1)(A) (West 2004)), or that she knowingly used, concealed, or abandoned the property in such a manner as to permanently deprive Tietz or the firm of its use or benefit (720 ILCS 5/16-1(a)(1)(B) (West 2004)).

¶ 40    Defendant claims that the evidence did not show that she intended to permanently deprive Tietz or the firm of any funds. She points to Tietz's testimony that they would eventually square up their finances as the firm became established and more profitable.

_____

[4]Although we need not reach the issue of the partners' agreement concerning the apportionment of firm profits, we note that it presents a credibility issue. We cannot conclude that no rational fact finder could have credited Tietz's testimony that they agreed to equally share firm profits.

¶ 41    "Since an intent to permanently deprive an owner of his property can seldom be proved by direct evidence it has been held that such intent may be deduced, or inferred, by the jury from acts committed and circumstances in evidence." *People v. Falkner*, 61 Ill. App. 3d 84, 87 (1978). However, as defendant notes, it may not be proven with mere speculation or conjecture. See *People v. Reich*, 241 Ill. App. 3d 666, 670 (1993).

¶ 42    Defendant relies on *People v. Jensen*, 103 Ill. App. 3d 451 (1982). In *Jensen*, the defendant, through use of a "sob story," deceived several victims into lending him money. They did not specify that the money needed to be repaid, but the defendant did state that he would repay the money. The court reversed the defendant's conviction, holding that the defendant's repayment declarations were not proven false and that the lack of repayment did "not necessarily negate an intention to repay." *Id.* at 455.

¶ 43    Here, defendant notes that she informed Tietz of her financial struggles due to her husband's health problems and unemployment, that the partners discussed allowing defendant to draw from the firm, and that, in the future, Tietz's and defendant's finances were expected to even out. Defendant argues that here, similar to *Jensen*, there was no proof that she *never* intended to reimburse Tietz following a full accounting of the firm. Defendant further points to Tietz's testimony that defendant asked to receive a paycheck due to her husband's issues and Tietz's testimony that she believed there was time to catch up to defendant's payments. Defendant also points to Tietz's testimony that she assumed that they would eventually "square up" the funds. Defendant does not dispute that she took certain funds from firm accounts or client fees and she concedes that she may have taken more than Tietz had contemplated or authorized, but she contends that this does not prove that she intended to permanently deprive Tietz or the firm of the funds. She urges that the mere possibility that she would not give Tietz her share is insufficient to show beyond a reasonable doubt the requisite intent. Defendant notes that she did not abscond with the funds and that the funds remained in her personal business account. Finally, defendant points to Slemp's testimony that she overheard Tietz tell defendant to deposit several checks from real estate closings, stating, "they're all yours, anyway."

¶ 44    We conclude that, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found that defendant intended to permanently deprive the firm or Tietz of the wrongfully taken funds. The evidence showed that the partners agreed that defendant would take payments from the firm only via the Paychex checks. The overwhelming evidence was that the parties agreed that defendant could not take proceeds from the firm's accounts or client fees. That Slemp testified to the contrary on this point was a credibility issue for the fact finder to resolve. The evidence also showed that defendant endorsed checks payable to the firm and deposited them into her personal account. Further, Watts testified that defendant instructed her to transfer funds from the firm's business operating account to the client trust account to make up a $6,000 deficiency in the trust account. Notably, Watts also testified as to two acts of concealment by defendant. First, she testified that defendant instructed her not to inform Tietz of the deficiency. Second, she testified that defendant destroyed a reconciliation report she had prepared for the partners.

¶ 45    Based on the foregoing evidence of concealment and repeated draws from the firm, a rational trier of fact could have found that defendant intended to permanently deprive the

firm and Tietz of the funds at issue.

¶ 46                          B. Sentencing-Restitution Amount

¶ 47    Next, defendant argues as an alternative to vacating her convictions of Class 1 felony theft that the trial court's restitution order be vacated and the cause remanded for a new determination of restitution. She contends that the restitution order was void because it was not statutorily authorized. Defendant claims that the restitution amount exceeded Tietz's out-of-pocket costs and did not account for defendant's partial interest in the funds at issue. We reject defendant's argument.

¶ 48    Any portion of a sentence that is not statutorily authorized is void. *People v. Felton*, 385 Ill. App. 3d 802, 805 (2008). A void order may be attacked at any time and is not subject to procedural default. *Id.* If, however, an order is improper because of a mistake of either law or fact, it is voidable and the error can be forfeited. *People v. Fouts*, 319 Ill. App. 3d 550, 552 (2001). As the State notes, the restitution order was entered without objection and defendant did not challenge the restitution amount in her motion to reconsider the sentence. See *People v. Marlow*, 303 Ill. App. 3d 568, 570 (1999) (a defendant who fails to object to an alleged error at sentencing or in a postsentencing motion forfeits any sentencing issues on appeal).

¶ 49    The restitution order here did not exceed the trial court's authority and, therefore, was not void. We review *de novo* whether a restitution order is statutorily authorized. *Felton*, 385 Ill. App. 3d at 805. The restitution statute authorizes restitution for "actual out-of-pocket expenses, losses, damages, and injuries suffered by the victim named in the charge." 730 ILCS 5/5-5-6(b) (West 2004). The trial court ordered $137,937.23 in restitution and directed payment to Tietz in $2,873 monthly installments. Defendant argues, as she did above in addressing the sufficiency of the evidence on the value of the wrongfully taken funds, that, at most, Tietz would have been entitled to one-half of the restitution award, based on the partners' agreement to equally share the firm's profits. The court's restitution award was, in her view, a windfall to Tietz and void. Defendant requests that we reduce the award to, at most, one-half of the amount awarded.

¶ 50    The trial court did not err in ordering $137,937.23 in restitution. Based on the evidence presented at trial, $137,937.23 was the value of the funds defendant wrongfully took from the firm or Tietz or, put another way, the actual "losses, damages, and injuries suffered by the victim[s] named in the charge." 730 ILCS 5/5-5-6(b) (West 2004). We do not read the out-of-pocket loss limitation in the restitution statute to require apportionment of funds unlawfully taken from the firm or Tietz. Thus, the restitution order was not void.

¶ 51    We also reject defendant's argument that our conclusion results in a windfall for Tietz. Defendant contends that, before the theft, Tietz had only a partial interest in the property, but that, after the theft, the trial court essentially awarded her the entire interest in the property. We disagree. First, we again note that, in the trial court, defendant did not challenge the restitution amount. Second, for purposes of calculating restitution for funds taken by theft, we do not agree that defendant necessarily retained any interest in the wrongfully taken funds, because there were two victims in this case: the firm and Tietz. The trial court

-12-

properly ordered, as restitution, the total amount stolen. Further, we have no quarrel with the fact that this view mirrors the result, in the civil context, in a case involving a law firm's lawsuit against certain partners who left the firm to start a new one. There, the court held that the former partners could not retain any compensation they earned while they were breaching their fiduciary duties to the firm. *Dowd*, 352 Ill. App. 3d at 385 (relying on the corporate law principle that "Illinois law permits a complete forfeiture of any salary paid by a corporation to its fiduciary during a time when the fiduciary was breaching his duty to the corporation"). We reject defendant's claim in her petition for rehearing that our holding, and our citation to *Dowd*, imposes criminal liability for defendant's breach of her (civil) fiduciary duty to the firm. To be clear, our rejection of her restitution argument is based solely on our reading of the statute and our conclusion that defendant's argument is not a reasonable interpretation of the provision.

¶ 52 Finally, as to defendant's emphasis that she took only from her firm and her partner and did not take any client funds, it has been noted that the acts are morally equivalent. See *In re Siegel*, 627 A.2d 156, 159 (N.J. 1993) (noting that there is "no ethical distinction between a lawyer who for personal gain willfully defrauds a client and one who for the same untoward purpose defrauds his or her partners").

¶ 53 In summary, the trial court did not err in ordering defendant to pay Tietz $137,937.23 in restitution.

¶ 54 C. Sentence-Monthly Installments

¶ 55 Defendant's final argument, raised as an alternative to vacating her theft convictions, is that the trial court abused its discretion in ordering her to make $2,873 monthly restitution payments without considering her ability to pay. She requests that we impose a repayment plan based on a fixed percentage, *i.e.*, 10%, of defendant's income or, alternatively, that we remand the cause for a hearing to determine the appropriate fixed monthly payment that would constitute a "feasible financial burden."

¶ 56 A trial court must determine a reasonable time and manner for the payment of restitution to ensure that restitution can be paid. *People v. Fuzz*, 218 Ill. App. 3d 418, 422 (1991). However, the trial court is not required to consider a defendant's financial circumstances when setting the amount of restitution; the trial court is required to consider the ability to pay only when determining the *time and manner of payment* or when considering a petition to revoke restitution. *People v. Gray*, 234 Ill. App. 3d 441, 444 (1992); 730 ILCS 5/5-5-6(f), (i) (West 2004). Further, "the court shall determine whether restitution shall be paid in a single payment or in installments, and shall fix a period of time not in excess of 5 years *** within which payment of restitution is to be paid in full." 730 ILCS 5/5-5-6(f) (West 2004). A trial court's order concerning the time and manner of payment of restitution is reviewed for an abuse of discretion. *People v. Stites*, 344 Ill. App. 3d 1123, 1125 (2003).

¶ 57 Defendant raised her inability to pay in her motion to reconsider the sentence. In that motion, defendant argued that, due to her unemployment and lack of job prospects, she would be unable to comply with the monthly restitution amount ordered by the court. At the hearing, defense counsel further argued that defendant had two children (ages 18 and 7) and

that, after practicing for 20 years, she was in the process of relinquishing her law license. Her only income was her husband's income (which was unspecified). Defense counsel likened the monthly restitution payments to paying a mortgage and argued that, even if defendant worked two or three jobs, she would be unable to pay the full restitution amount within 48 months. In denying the motion, the court acknowledged its understanding of the magnitude of the payments, but it also acknowledged that Tietz had "been forever harmed" by defendant and that the cause had been pending for five years. The judge also noted his familiarity with defendant, whom he had known since she began practicing law. The judge also noted that, if, in the future, defendant were unable to make the payments (for failure, for example, to obtain employment), she could petition the court for a modification. 730 ILCS 5/5-5-6(i) (West 2004).

¶ 58 We first reject defendant's argument that the trial court did not at all consider her ability to pay. The trial judge specifically mentioned his familiarity with defendant. Also, the facts that defendant was about to relinquish her law license and that she was unemployed were before the court. The court also noted its understanding of the magnitude of the burden that the $2,873-per-month restitution payments imposed, but it nonetheless denied defendant's request to reconsider the sentence. We find no error with its decision to impose the monthly restitution amount.

¶ 59 In arguing in the alternative for a modification of the restitution order to one based on 10% of her income, defendant relies on several cases where the reviewing court modified a restitution order from a fixed monthly amount to one based on a fixed percentage of the defendant's net income. See *People v. Reece*, 228 Ill. App. 3d 390, 392, 396 (1992) (upon holding that the $39,159 restitution order imposed an " 'impossible financial burden,' " even if the defendant could return to his job after his four-year term of incarceration, the court remanded for a redetermination of the proper amount or method of payment based on a fixed percentage of the defendant's net income, where the defendant was the sole support for his wife and three children and earned $7.35 per hour (for 35 hours per week) at his last job); *People v. Rupert*, 148 Ill. App. 3d 27, 29-30 (1986) (modifying $200-per-month-for-four-years restitution order to 10% of the defendant's net monthly income and extending restitutionary period to five years, where, after taking judicial notice of the fact that the defendant had a new, lower-paying job, the court concluded that the defendant's college degree in law enforcement administration would be of limited use due to his criminal record and where his income in the previous year was $6,000 and was not likely to significantly increase in the future); *People v. Knowles*, 92 Ill. App. 3d 537, 540-41 (1980) (modifying a $1,176-per-month-for-59-months restitution order to one based on monthly payments of 10% of the defendant's net income for a five-year period (and set at a $53,891 maximum amount), where the defendant's gross salary the previous year was $6,570, his gross income was just over $125 per week, and he was repaying his parents between $10,000 and $15,000 for his legal fees and related costs).[5]

---

[5]Thus, in *Reece*, the challenged restitution order equaled the defendant's income. In *Knowles*, it exceeded the defendant's income. Finally, in *Rupert*, it was initially 25% of the defendant's income and would have been higher due to his new, lower-paying job.

¶ 60 Defendant requests a fixed percentage of her income, arguing that few people, including those with steady incomes, could comply with an order mandating such a "high" monthly payment. She suggests that a modification to 10% of her net monthly income would help ensure that the restitution payments will be made to Tietz, because the payment amount would be more realistic and within defendant's ability to pay.

¶ 61 We decline defendant's request to remand for a hearing to modify the restitution order. As the record stands, we are unable to assess whether defendant's unemployment status as of the hearing on her motion to reconsider would be long-term or temporary. Although defendant will not be working as an attorney for the majority of the restitutionary period, she is a highly educated and experienced person who should be able to obtain work earning an above-average salary. If this does not occur or if her income is insufficient for purposes of making her restitution payments, defendant can, as the trial court noted, petition the court for a modification. We cannot conclude that the trial court's ruling was unreasonable.

¶ 62          III. CONCLUSION

¶ 63 For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

¶ 64 Affirmed.