******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* TREMAINE S. SMITH
(AC 33542)

Lavine, Bear and Sheldon, Js.

*Argued January 15, 2013—officially released March 18, 2014*

(Appeal from Superior Court, judicial district of
Waterbury, Prescott, J.)

*Elizabeth M. Inkster*, assigned counsel, and *Samuel Greenberg*, certified legal intern, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Terence D. Mariani, Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BEAR, J. The defendant, Tremaine S. Smith, appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-134 (a) (3). On appeal, the defendant claims that (1) there was insufficient evidence to convict him of attempt to commit robbery in the first degree, and (2) prosecutorial impropriety during final argument deprived him of his due process right to a fair trial. We agree that there was insufficient evidence presented to the jury to convict the defendant of attempt to commit robbery in the first degree, and accordingly, we reverse the judgment of the trial court. Because the defendant's insufficient evidence claim is dispositive of the present appeal, we do not address the defendant's prosecutorial impropriety claim.

The following facts that reasonably could have been considered or found by the jury and procedural history are relevant to our decision. The defendant and the female complainant became romantically involved in April, 2009. The defendant went to prison in August, 2009. In mid to late November, 2009, the defendant in one mailing sent $294 in cash to the complainant, and he told her to use the money to hire a lawyer or obtain a bond for him. The complainant represented to the defendant in their communications during his incarceration that she would hire a lawyer or obtain a bond for him with the money that he had sent to her, but she did not do so. Instead, she kept the specific bills that the defendant had sent to her, and at the time of trial she still had control of most of those bills, other than those she had returned to him after the incident that led to his arrest.

On Sunday, November 29, 2009, the defendant and the complainant spoke on the telephone. The defendant was angry that she had not hired a lawyer for him, and he told her that he would see her upon his release from prison. She believed that he would be released from prison on the following Friday, December 4, 2009, based on what he had told her.

The defendant, however, was released from prison on Monday, November 30, 2009. At 5:45 p.m., he called Shanika Crews, who was approximately five and one-half months pregnant with the defendant's son at the time of the incident. He asked her to meet with him at a residence on Buckingham Street in Waterbury. After they had spent some time together with his family there, he asked to borrow her cell phone, and, shortly thereafter, she drove him to Platt Street in Waterbury, at his request. The defendant exited the vehicle upon their arrival at Platt Street and ran down an alley. He returned to the vehicle ten to fifteen minutes later and told her that the complainant was not there. Crews then

received a call on her cell phone from an unidentified caller. She gave the phone to the defendant, and, after the defendant spoke to the caller, he instructed Crews to drive him to Aldi's, a grocery store located near the Waterbury Plaza shopping center in Waterbury.

Meanwhile, on that day, the complainant left her home on North Main Street in Waterbury for a period of time during the day. She learned from her mother upon her return that the defendant had called to say that he had been released from prison and that he was going to stop by her home. At approximately 7:30 p.m., the complainant left her home to get something to eat at the Subway sandwich shop located in the Waterbury Plaza. She was accompanied by her brother and a friend.

The defendant exited the vehicle driven by Crews when he saw the complainant, her brother, and her friend walking toward the Waterbury Plaza. The complainant testified that she heard somebody call out her name as she, her brother, and her friend walked, and when she looked, she saw the defendant. Both she and her brother testified that the defendant was talking on a cell phone as he approached them, and he angrily said, "I found this bitch, and I'm gonna fuck her up." The complainant's friend testified, however, that the defendant exited the vehicle upon seeing them, hugged her and the complainant's brother,[1] and began asking the complainant questions, at least one of which was about a lawyer. The complainant's brother testified that the defendant also asked the complainant "about some type of money," as soon as he finished his phone call. The complainant's friend further testified that the defendant was "[c]alm at first . . . ."

In contrast, the complainant testified that the defendant was "mad," and that she started to back away because she thought he was "crazy" and "losing it." The defendant and the complainant then began to engage in a series of struggles in which they argued, the defendant grabbed the complainant, and the complainant broke free and tried to walk away. The complainant testified that the argument was about the defendant's desire to have the complainant go with him in order to get his money and her refusal to do so. She had intended to return the money to him, but she told him that "he wasn't getting [the money]" because he "had the knife and was acting crazy," "was pulling and grabbing on" her, and was "tripping . . . ." She also testified: "I said I don't have the money with me out here. I said the money is with my sister."

The defendant grabbed the complainant by her hair, arm, and neck. He had a pocketknife in one of his hands. There was conflicting testimony about whether the defendant placed the knife on the complainant or pointed it at her during this series of struggles. The complainant testified that the defendant held the knife to her stomach, while the complainant's brother testi-

fied that the defendant did not place the knife on or point the knife at the complainant's neck or stomach. The defendant did not say "give me your money," "give me your cell phone because you owe me money," or "empty out your pockets and let me see how much money you have" during this series of struggles.[2] The complainant's friend and the complainant's brother tried to intervene, but the defendant threatened to kill them if they did not leave.

After the complainant broke free of the defendant's grasp on her neck, Crews exited her vehicle, grabbed the complainant by the arm, and told her to get into the vehicle. The complainant refused, "freak[ed] out," and told Crews to let her go. While the complainant and Crews struggled near the car, the defendant approached them and swore on the life of his unborn son that he would kill the complainant. Crews released the complainant, and the complainant began to run toward her house. The defendant, the complainant's brother, and the complainant's friend followed her. The complainant testified that she ran, while the complainant's friend and the complainant's brother testified that they, the defendant, and the complainant were all walking fast. The complainant told her brother to get help, and he left in order to do so.

The defendant caught up with the complainant in front of a flower shop located between Aldi's and the complainant's house. He grabbed the hood of her sweatshirt and ripped out some of her hair extensions in the process. An unidentified person pulled up to them in his vehicle and said that he was going to call the police. The complainant testified that the car approached while she and the defendant stood in front of the flower shop and argued about "[t]he money." She provided in her written statement to the police, however, that the defendant "was pulling [her]" when the unidentified person pulled up to them. When the defendant approached the unidentified person and his vehicle, the complainant began to walk away.

The defendant caught up with the complainant again at the firehouse across the street from the flower shop. The complainant testified: "I'm sitting in the grass because I fell and [the complainant's friend was] standing on one side and he's standing there in front of me with the knife, and the firefighter came and asked if everything was good." The complainant testified that she fell because "I'm sick, I have a medical condition where my body shuts down." The complainant's friend testified that she told the defendant to get away from the complainant, who "broke down and fell and crawled up into a ball." The complainant's friend also testified that she saw the defendant's knife while the three of them were in front of the firehouse, first behind his back and then close to, but not touching, the complainant's neck and "near her on her back." The complainant

likewise testified that the defendant had the knife at her throat while they were in front of the firehouse. According to the complainant, the defendant told the complainant's friend that the complainant "better have my money . . . ." He then told the complainant that he would stop by her house later and subsequently walked away.

A firefighter for the city of Waterbury testified that he was present in the firehouse on the night of the incident. An unidentified person knocked on the back door of the firehouse and told the firefighter that "somebody was getting beat up in front of the firehouse." From his position inside the firehouse, the firefighter could see three people, one of whom was a woman saying, "I don't want to go," and trying to get away from a man who "was trying to pull her somewhere." The firefighter exited the firehouse and encountered the complainant, who was crying, and the complainant's friend; the defendant already had begun to walk away. The firefighter testified: "[T]hey were just sitting down, and I was asking if everything was okay." They answered in the affirmative. The complainant testified that neither she nor her friend said anything to the firefighter.

After the firefighter left the complainant and the complainant's friend, the complainant returned to her home. She later went to the Waterbury police station that night and gave a written statement about the incident at 8:43 p.m. Subsequently, the defendant was arrested and charged pursuant to an information dated December 2, 2009, with (1) assault in the third degree in violation of General Statutes § 53a-61, (2) unlawful restraint in the first degree in violation of General Statutes § 53a-95, (3) reckless endangerment in the second degree in violation of General Statutes § 53a-64, (4) threatening in the second degree in violation of General Statutes § 53a-62, and (5) breach of the peace in the second degree in violation of General Statutes § 53a-181. The state subsequently filed a long form substitute information on January 21, 2011, in which it charged the defendant in count one with (1) attempt to commit robbery in the first degree in violation of §§ 53a-49 (a) (2) and 53a-134 (a) (3), and in count two (2) attempt to commit kidnapping in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-92 (a) (2) (B).

The complainant met with the defendant several days after the incident, gave him some money as partial payment for the $294,[3] and had sexual intercourse with him. Even though there was a protective order against the defendant with respect to the complainant, they maintained contact with each other, and he wrote her a letter in October, 2010, while he was incarcerated, to ask that she change her statement to the police. The complainant was a reluctant witness, and she was subpoenaed to testify at trial.

The trial commenced on February 16, 2011. On February 17, 2011, after the state rested, the defendant made an oral motion for a judgment of acquittal. The basis for the motion was that the evidence was insufficient for the state to meet its burden of proof with respect to both counts of the information. The court denied the motion on the ground that the evidence was sufficient for the jury to find the essential elements of both offenses, and it stated with respect to count one: "There is evidence that the defendant believed that the [complainant] . . . owed him money, that he . . . got out of the car at the relevant date and time, and that he attempted to rob her with a dangerous instrument, a knife, by threatening her with the knife for the purpose of getting . . . her to return the [$294] that he believed that he was entitled to."

The court further stated: "The . . . only remaining point that I'll make about the motion for judgment of acquittal is [that defense counsel] mentioned the fact . . . that the property belonged to him . . . and therefore . . . with respect to the robbery in the first degree, that there's not sufficient evidence of a larceny. That really relates to . . . your attempt to introduce a defense into this case that the robbery was committed and is justified through . . . the use of physical force in defense of property.

"We're going to talk about that issue at . . . greater length with respect to the charging conference, but . . . I've indicated to you . . . and counselor, based upon the case law that's been brought to my attention, that I don't believe that your client is entitled to a jury instruction on that issue. And having said that, if he's not entitled to an instruction, which certainly there's evidence that he was attempting to take from her, the [complainant], money . . . that she had, whether or not she ultimately had some obligation to give it back to him, would not mean that . . . he did not commit a robbery in the first degree by attempting to take it. That . . . criminal conduct if proven by the state is criminal, unless and until the jury concludes, if properly instructed, that the actions were taken in defense of property. And since . . . I'm of the view that he's not entitled to, under the facts and circumstances of this case, to such an instruction . . . that can't be the basis of granting a motion for judgment of acquittal with respect to count one."

On February 18, 2011, during its deliberations, the jury sent a note to the court that read in relevant part: "We . . . request an explanation from the judge regarding the issue of possession of the money. Our specific concern regards the issue of recovering what you perceive as your own property/larceny—robbery. In our deliberations should we be discussing who the money rightfully belongs [to]." The court replied in relevant part: "I'm going to give you the following additional

instruction: As I said on page twenty-six of the jury instructions, under the circumstances of this case, the defendant had no legal justification or excuse to seek through the use of force, or the threat of the use of force, repayment of any money that [the complainant] may have owed him. I'm going to add the following additional sentence for you: In other words, the fact that the defendant perceived that the $294 was rightfully his does not permit him, lawfully, to use force or the threat of the use of force, to get the money back."[4]

On February 22, 2011, the jury returned a verdict of guilty on count one, attempt to commit robbery in the first degree, and not guilty on count two, attempt to commit kidnapping in the first degree. The defendant subsequently filed, inter alia, a written motion for a judgment of acquittal on February 28, 2011. In that motion, he argued that the evidence was insufficient for the state to have established the intent element of larceny and therefore the intent element of attempt to commit robbery in the first degree, because "[n]o rational trier of fact could, from the evidence in this case, find beyond a reasonable doubt that the defendant intended to steal any money from [the complainant] at the same time that he used force or threatened to use force with a dangerous instrument against [the complainant]." The court denied the motion on April 15, 2011. It thereupon sentenced the defendant to an eleven year term of incarceration. This appeal followed.[5]

I

The defendant claims on appeal that the evidence was insufficient to establish beyond a reasonable doubt that he, with the intent to deprive another of property, wrongfully attempted to take, obtain, or withhold such property from an owner, pursuant to the larceny statute, General Statutes § 53a-119, and that the state was required to prove all of the elements of larceny in order to prove all of the elements of attempt to commit robbery in the first degree. Because the evidence was insufficient to establish the defendant's guilt beyond a reasonable doubt on the intent element of larceny and therefore attempt to commit robbery in the first degree, the defendant argues, in accordance with *State* v. *Gooden*, 89 Conn. App. 307, 312, 873 A.2d 243, cert. denied, 275 Conn. 918, 919, 883 A.2d 1249 (2005), that his "fundamental right, protected by the due process clauses of the federal and Connecticut constitutions, to be acquitted unless proven guilty of each element of the charged offense beyond a reasonable doubt" has been violated. (Internal quotation marks omitted.) We agree with the defendant that the evidence was insufficient to establish the intent element of larceny and therefore the intent element of attempt to commit robbery in the first degree.

"A defendant who asserts an insufficiency of the evidence claim bears an arduous burden." (Internal quota-

tion marks omitted.) *State* v. *Rodriguez*, 146 Conn. App. 99, 110, 75 A.3d 798, cert. denied, 310 Conn. 948, 80 A.3d 906 (2013). "In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Stephen J. R.*, 309 Conn. 586, 593–94, 72 A.3d 379 (2013).

"If, however, the evidence is insufficient to meet the burden of proof of guilt beyond a reasonable doubt, bearing in mind that the state has the burden of establishing by such proof every essential element of the crime charged, the verdict must be set aside." *State* v. *Jackson*, 176 Conn. 257, 262, 407 A.2d 948 (1978). "As has been said so often, proof beyond a reasonable doubt is such proof as precludes every reasonable hypothesis except that which it tends to support and is consistent with the defendant's guilt and inconsistent with any other rational conclusion. . . . Moreover, inferences which do not have a basis in facts established by the evidence cannot be drawn or relied upon to sustain a verdict." (Citations omitted; internal quotation marks omitted.) Id., 263–64.

"We note that the probative force of the evidence is not diminished because it consists, in whole or in part, of circumstantial evidence rather than direct evidence. . . . It has been repeatedly stated that there is no legal distinction between direct and circumstantial evidence so far as probative force is concerned. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . [T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *Best*, 56 Conn. App. 742, 752, 745 A.2d 223, cert. denied, 253 Conn. 902, 753 A.2d 937 (2000).

II

We begin by discussing the statutes that govern the attempt to commit robbery in the first degree charge against the defendant. "[O]ur review of [an] issue of statutory interpretation is plenary." *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 265 Conn. 79, 89, 828 A.2d 31 (2003). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Footnote omitted; internal quotation marks omitted.) *Picco* v. *Voluntown*, 295 Conn. 141, 147, 989 A.2d 593 (2010). "[S]tatutes should be construed, where possible, so as to create a rational, coherent and consistent body of law." *Waterbury* v. *Washington*, 260 Conn. 506, 557, 800 A.2d 1102 (2002).

Furthermore, "[i]t is a basic tenet of statutory construction that the legislature [does] not intend to enact meaningless provisions. . . . [I]n construing statutes, we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous. . . . Because [e]very word and phrase [of a statute] is presumed to have meaning . . . [a statute] must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant." (Internal quotation marks omitted.) *Lopa* v. *Brinker International, Inc.*, 296 Conn. 426, 433, 994 A.2d 1265 (2010).

We first consider our criminal attempt statute. Section 53a-49 (a) (2) provides: "A person is guilty of an attempt to commit a crime if, *acting with the kind of mental state required for commission of the crime*, he . . . intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." (Emphasis added.)

We next look at the relevant robbery statutes. Section 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of

the commission of the crime of robbery as defined in section 53a-133 or immediate flight therefrom, he or another participant in the crime . . . (3) uses or threatens the use of a dangerous instrument . . . ." In turn, General Statutes § 53a-133 provides: "A person commits robbery when, *in the course of committing a larceny*, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny." (Emphasis added.)

Finally, we consider our larceny statute and the statutory provisions defining its terms. Section 53a-119 provides in relevant part: "A person commits larceny when, *with intent to deprive another of property* or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an *owner*. . . ." (Emphasis added.) General Statutes § 53a-118 (a) (5) defines "an owner" as used in § 53a-119: "An 'owner' means any person who has a right to possession superior to that of a taker, obtainer or withholder." Additionally, in cases involving multiple thieves, which is not this case, § 53a-118 (b) provides: "A person who has obtained possession of property by theft or other illegal means shall be deemed to have a right of possession superior to that of a person who takes, obtains or withholds it from him *by larcenous means*." (Emphasis added.)

The plain and unambiguous language of these statutes establishes that the elements of attempt to commit robbery in the first degree can be proved only if all of the elements of larceny are proved first. The elements of larceny are spelled out clearly in § 53a-119: "Connecticut courts have interpreted the essential elements of larceny as (1) the wrongful taking or carrying away of the personal property of another; (2) the existence of a felonious intent in the taker to deprive the owner of [the property] permanently; and (3) the lack of consent of the owner." (Internal quotation marks omitted.) *State v. Sherman*, 127 Conn. App. 377, 391, 13 A.3d 1138 (2011).

Despite the plain meaning and lack of ambiguity in the language and organization of the statutes that govern the present case, the state argues that "the legislature has the prerogative to redefine the elements of larceny in particular contexts and has done so with respect to proving larceny as a component of robbery." The state more specifically argues that it was not required to establish beyond a reasonable doubt that the complainant had a possessory interest superior to that of the defendant in the $294 beyond a reasonable doubt in order to prove the attempted robbery charge.

The state takes this position because it repeatedly has conceded that the defendant and not the complainant "owned" the property that the defendant sought to retake. The basis for the state's statutory interpretation is General Statutes § 53a-21, which provides in relevant part: "A person is justified in using reasonable physical force upon another person when and to the extent that he reasonably believes such to be necessary to prevent an attempt by such other person to commit larceny . . . or when and to the extent he reasonably believes such to be necessary to regain property which he reasonably believes to have been acquired by larceny within a reasonable time prior to the use of such force; but he may use deadly physical force under such circumstances only in defense of person as proscribed in section 53a-19."

The state argues that § 53a-21, as part of "the constellation of robbery statutes and attending case law reveals that, in such a situation, the legislature intended that the elements of robbery cover the defendant's intentional retaking of his own property that is in the custody and control of another person, where the defendant employs the 'threat of or the immediate use of physical force.' " The state elaborates that § 53a-21, as a justification defense, "covers conduct that would be 'otherwise criminal,' " and it "can be interposed as a defense to robbery because the statute's plain terms do not limit its availability to any particular offense, but rather to the character of the force employed, or its reasonableness. . . . In addition, both provisions pertain to the same general conduct: the use of physical force in the intentional taking of property from another, with the defense triggered by the subset of that conduct involving the retaking of property acquired by larceny. As a result, in the context of the defense of being 'trigger[ed]' by the special circumstance of the use of reasonable physical force to regain property . . . what is 'otherwise criminal conduct' under the robbery statute, yet justified, is the defendant's recourse to such reasonable force based on his reasonable belief that another acquired his property by larceny, conduct that is not dependent upon an intent to steal on his part and his ownership [of] the property. . . . But where the justification defense cannot be applied to robbery involving the reclaiming of property due to either: (1) the use of unreasonable force . . . or (2) the use of 'deadly physical force' . . . the conduct that is 'otherwise criminal' and subject to punishment, because it is unjustified, is the intentional retaking of one's own property by force or violence, irrespective of the lack of intent to steal and ownership of the property." (Citations omitted.)

"In construing the meaning of a statute . . . courts do not torture words to import ambiguity where the ordinary meaning leaves no room for it . . . ." (Internal quotation marks omitted.) *Gomes* v. *Massachusetts Bay Ins. Co.*, 87 Conn. App. 416, 425, 866 A.2d 704, cert.

denied, 273 Conn. 925, 871 A.2d 1031 (2005). Yet, the state would have this court twist the language of the relevant statutes into a posture that eliminates the need of the state to prove the explicit "property of *another*" element of larceny, in order to effect the statutory interpretation that it advances. We note that the state repeatedly refers to legislative intent in setting forth its interpretation, but it does not once cite to any legislative history for support.

Although the legislature has redefined the elements of larceny with respect to specific types of larceny; see, e.g., *State* v. *Foster*, 45 Conn. App. 369, 377–78, 696 A.2d 1003 (specific intent to deprive owner of property not element of larceny by receipt of stolen property under § 53a-119 [8]), cert. denied, 243 Conn. 904, 701 A.2d 335 (1997); it has not redefined them with respect to larceny as a necessary component of attempt to commit robbery in the first degree.[6] We therefore apply what our courts have recognized as the three essential elements of larceny in resolving the present appeal: "(1) the wrongful taking or carrying away of the personal property of another; (2) the existence of a felonious intent in the taker to deprive the owner of [the property] permanently; and (3) the lack of consent of the owner." (Internal quotation marks omitted.) *State* v. *Sherman*, supra, 127 Conn. App. 391.

### III

### A

There is no question about what specific property the defendant sought to retake from the complainant. The complainant, her brother, her friend, and Crews all testified that the November 30, 2009 incident resulted from the defendant's efforts to have the complainant return the $294 that he sent to her for a bail bond or a lawyer. During trial, defense counsel asked the complainant, her brother, and Crews if the defendant had attempted to take any money or objects from the complainant that were on her person on the night of the incident, and they all answered in the negative. There is no evidence in the record that is contrary to these testimonial assertions.

### B

Our larceny statute, § 53a-119, requires a wrongful taking, obtainment, or withholding of property from an "owner." We again note that § 53a-118 (a) (5) defines an "owner" as "any person who has a right to possession superior to that of a taker, obtainer or withholder." Although this court has stated that "[a] showing that the [complainant] had custody or control over the appropriated property is sufficient to support a charge of larceny"; (internal quotation marks omitted) *State* v. *Hyde*, 104 Conn. App. 574, 579, 935 A.2d 639 (2007), cert. denied, 285 Conn. 910, 940 A.2d 809 (2008); that showing applies only to cases where, even if the com-

plainant may have had less than full legal ownership of the appropriated property, the defendant had no legally recognizable interest in the property whatsoever.

In *Hyde*, the defendant took a toolbox from a shed on the victim's rental property and claimed on appeal that the state had not established the victim's ownership of the toolbox to prove that he had committed larceny because there was evidence that the victim's husband had given him permission to use it. This court rejected the defendant's position and held that the victim was the owner of the toolbox where there was evidence that the victim was "the tenant in lawful possession of [the property] and that the shed there contained property belonging to her." Id. Similarly, in *State* v. *McColl*, 74 Conn. App. 545, 548–49, 813 A.2d 107, cert. denied, 262 Conn. 953, 818 A.2d 782 (2003), the defendant burglarized the elderly victims' apartment, and this court noted for purposes of the robbery in the first degree charges against the defendant that the victims "both clearly had a greater right of possession to the [stolen property] than did the defendant" under § 53a-118 (a) (5). Id., 574 n.23; accord *State* v. *Taylor*, 196 Conn. 225, 229–30, 492 A.2d 155 (1985); *State* v. *Ingram*, 43 Conn. App. 801, 822–23, 687 A.2d 1279 (1996), cert. denied, 240 Conn. 908, 689 A.2d 472 (1997). Our Supreme Court has even held in *State* v. *Morant*, 242 Conn. 666, 671–72, 701 A.2d 1 (1997), that a victim who has custody or control over contraband has a superior possessory right in it for a charge of larceny than does a defendant who subsequently takes it under the belief that he owns it because "[a] person should not be allowed to vest himself with a possessory interest by crime or to invoke the law in order to disengage himself from the unlawfulness of his conduct." See also *State* v. *Crosswell*, 223 Conn. 243, 252–55, 612 A.2d 1174 (1992).

In this case there is no claim that the defendant was not the legal owner of the $294 he sent to the complainant,[7] and there was evidence presented to the jury that the defendant was seeking the return of his specific property. As previously set forth, the court stated: "There is evidence that the defendant believed that the [complainant] . . . owed him money, that he . . . got out of the car at the relevant date and time, and that he attempted to rob her with a dangerous instrument, a knife, by threatening her with the knife for the purpose of getting . . . her to return the [$294] that he believed that he was entitled to." Also, as previously noted, the state repeatedly has conceded that the defendant, and not the complainant, "owned" the property that the defendant sought to retake.

This court previously has determined: "Because larceny is a specific intent crime, the state must show that the defendant acted with the subjective desire or knowledge that his actions constituted stealing. A specific intent to deprive another of property or to appro-

priate the same to himself . . . is an essential element of larceny . . . and as such must be proved beyond a reasonable doubt by the state. . . .

"The animus furandi, or intent to steal, is an essential element of the crime of larceny at common law. . . . Since the taking must be with felonious intent . . . taking under a bona fide claim of right, however unfounded, is not larceny. . . . [A]lthough ignorance of the law is, as a rule, no excuse, it is an excuse if it negatives the existence of a specific intent. Therefore, *even if the taker's claim of right is based upon ignorance or mistake of law, it is sufficient to negative a felonious intent.* A fortiori, a mistake of fact, if it is the basis of a bona fide claim of right, is sufficient. . . . *One who takes property in good faith, under fair color of claim or title, honestly believing that . . . he has a right to take it, is not guilty of larceny even though he is mistaken in such belief, since in such case the felonious intent is lacking.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Varszegi*, 33 Conn. App. 368, 372–73, 635 A.2d 816 (1993), cert. denied, 228 Conn. 921, 636 A.2d 851 (1994); accord *State* v. *Papandrea*, 120 Conn. App. 224, 229–30, 991 A.2d 617 (2010), aff'd, 302 Conn. 340, 26 A.3d 75 (2011). "[T]he defendant's claim of an innocent intent, if accepted by the jury, would negate an essential element of the crime and mandate a verdict of not guilty. This defense is intrinsically factual, however, and not of the type which we have held to require a distinct instruction as part of the trial court's charge." (Internal quotation marks omitted.) *State* v. *Woolfolk*, 8 Conn. App. 667, 672, 517 A.2d 252 (1986), cert. denied, 202 Conn. 802, 519 A.2d 1207 (1987).[8]

This principle is deeply entrenched in our law of larceny. Our Supreme Court enunciated in *State* v. *Main*, 75 Conn. 55, 59, 52 A. 257 (1902): "[T]o constitute the crime there must be not only a wrongful taking, but a wrongful taking with the intent of thus depriving the real owner of his property by appropriating it to the use of the taker; that although the property of another is wrongfully taken, yet if taken through mistake, theft is not committed; there must be a taking with a criminal intent and, as bearing upon the facts and claims in the case, a felonious taking requires a knowledge in the taker that the thing taken is the property of another, and an intention to deprive the owner thereof by appropriating it to his own use . . . ."

Because a claim of right defense may negate the intent element of a larceny charge, the state bears the burden of disproving it under General Statutes § 53a-12 (a). Section 53a-12 (a) provides: "When a defense other than an affirmative defense, is raised at a trial, the state shall have the burden of disproving such defense beyond a reasonable doubt." In contrast, § 53a-12 (b) provides: "When a defense declared to be an affirmative

defense is raised at a trial, the defendant shall have the burden of establishing such defense by a preponderance of the evidence." A claim of right defense is not an affirmative defense because "an affirmative defense does not serve to negate an element of the crime which the state must prove in order to convict, but constitutes a separate issue or circumstance on which the defendant is required to carry the burden of persuasion." *State* v. *Woolfolk*, supra, 8 Conn. App. 671.

Our state's burden allocation for a claim of right defense to a larceny charge accords with the approaches taken by many other jurisdictions. "In larceny prosecutions the law casts no burden of proof upon the defendant. Under the rule applicable to criminal cases generally in most states, one accused of larceny does not bear the burden of establishing an alibi although he or she offers evidence upon that question, but the evidence to support it should be considered in connection with the other evidence in the case and the accused acquitted if there is a reasonable doubt of guilt." (Footnotes omitted.) 50 Am. Jur. 2d 130–31, Larceny § 121 (2006). Consistent with this principle, a past iteration of New York's larceny statute that characterized a claim of right defense as an affirmative defense was deemed unconstitutional because the characterization "impermissibly shifted the burden onto the defendant to disprove the element of intent." *People* v. *Green*, 5 N.Y.3d 538, 542, 841 N.E.2d 289, 807 N.Y.S.2d 321 (2005).[9]

C

The evidence before the jury was clear about how the $294 came into the complainant's possession, and the complainant testified repeatedly that the money belonged to the defendant. We also note again that the state concedes that "the record reflects inadequate proof of . . . the [defendant's] intent to steal and the wrongful taking of property that the [complainant] either owns or to which the [complainant] has a superior right." For purposes of resolving the present appeal, we accept the state's concession, even though we could determine that we are not bound by it. See *State* v. *Putnoki*, 200 Conn. 208, 219 n.6, 510 A.2d 1329 (1986). Even absent the state's concession, the trial record confirms that the state failed to prove all of the elements of larceny.[10]

The arrangement between the defendant and the complainant regarding the $294 was akin to a bailment, that is, "[a] relationship . . . [that] arises when the owner, while retaining general title, delivers personal property to another for some particular purpose upon an express or implied contract to redeliver the goods when the purpose has been fulfilled, or to otherwise deal with the goods according to the bailor's directions. . . . In a bailment, the owner or bailor has a general property [interest] in the goods bailed . . . . The

bailee, on the other hand, has mere possession of items left in its care pursuant to the bailment." (Citations omitted; internal quotation marks omitted.) *B. A. Ballou & Co.* v. *Citytrust*, 218 Conn. 749, 753, 591 A.2d 126 (1991).

Given this framework, the complainant's "mere possession" of the $294 could not have been superior to the defendant's "general property interest" in it for purposes of applying § 53a-118 (a) (5). The defendant also could not be characterized as a "taker, obtainer or withholder" of another's property under § 53a-118 (a) (5) instead of as the "owner" when he retained a "general property interest" in the $294 at all times relevant to the present case. The present case, thus, is factually and legally distinguishable from *State* v. *Marsala*, 59 Conn. App. 135, 140, 755 A.2d 965, cert. denied, 254 Conn. 948, 762 A.2d 905 (2000), in which this court held that the bailor defendant committed larceny when he took his vehicle from the bailee repair shop's premises after a dispute over repair costs because the bailee's "continued right of possession . . . became superior to that of the defendant" when the bailee registered a statutory lien on the vehicle. Here, there is no authority that recognizes the complainant's right of possession to the specific bills totaling the $294 as superior to the defendant's right deriving from his ownership of those bills under the present circumstances, nor is there evidence of any conduct by the complainant after her receipt of the specific bills that would establish her superior right of possession to them.

Our conclusion does not change if we apply the definition of an "owner" under § 53a-118 (b) instead of the one under § 53a-118 (a) (5). Section 53a-118 (b), which applies in the context of two or more sequential thefts, modifies the definition of an "owner" in order to encompass those who acquire property by illegal means: "A person who has obtained possession of property by theft or other illegal means shall be deemed to have a right of possession superior to that of a person who takes, obtains or withholds it from him *by larcenous means*." (Emphasis added.) Therefore, if the defendant had stolen the $294, which was not alleged or proved in this case, he still would have had a right of possession of such $294 superior to that of the complainant, if she had been found to have withheld that money from him by larcenous means.

During the trial, the defendant requested a jury instruction for a justification defense under § 53a-21, which provides in relevant part: "A person is justified in using reasonable physical force upon another person when and to the extent that he reasonably believes such to be necessary to prevent an attempt by such other person to commit larceny . . . or when and to the extent he reasonably believes such to be necessary to regain property which he reasonably believes to have

been acquired by larceny within a reasonable time prior to the use of such force; but he may use deadly physical force under such circumstances only in defense of person as proscribed in section 53a-19.''

The defendant argued in support of the request, inter alia, that the "particular point . . . where the larceny occurs was, she refused to give back money that she's not entitled to, it's not her property, it becomes unlawful when she refuses at that particular point." The court denied the request, and neither the court nor the parties during the remainder of the trial again addressed the issue of whether the complainant had committed a larceny. The defendant expressly argues on appeal that he "is not claiming . . . that he has a 'legally recognized defense' of justification that entitled him to take back his property by force. He is also not claiming that he was acting to prevent a larceny." Nevertheless, even if we assume arguendo that the complainant's refusal to return the $294 to the defendant qualifies as "theft" or a retention "by . . . illegal means" under § 53a-118 (b), the statute would be unavailable as a basis for vesting the complainant with a right of possession superior to that of the defendant.

The court was mistaken in emphasizing the defendant's use of force over his claim of ownership when it defined the elements of larceny, both in its rationale for denying the defendant's oral motion for a judgment of acquittal and in its jury instructions. As previously noted, the court stated in relevant part with respect to the defendant's oral motion for a judgment of acquittal: "[C]ertainly, there's evidence that he was attempting to take from her, the alleged victim, money that . . . she had, *whether or not she ultimately had some obligation to give it back to him, would not mean that . . . he did not commit a robbery in the first degree by attempting to take it.*" (Emphasis added.) The court further provided with respect to its jury instructions: "A person commits larceny when, with intent to deprive another of property, he wrongfully takes, obtains or withholds such property from an owner. . . . 'Wrongfully' means that the defendant had no legal justification or excuse for taking the property. Under the circumstances of this case, the defendant had no legal justification or excuse to seek, through the use of force or the threat of the use of force, repayment of any money that [the complainant] may have owed him."

Characterizing the defendant's use of force in this case as "justified" could be considered tantamount to sanctioning an unregulated practice of violent self-help as a means of recovering one's own property. An application of the definition of an "owner" under § 53a-118 (a) (5) and (b), however, that disregards a defendant's bona fide claim of ownership, especially where the complainant and the state agree that the defendant is the rightful owner of the property, errs in the opposite

direction. Under this incorrect interpretative methodology, the complainant can be found to be the "owner" of the $294 that indisputably belonged to the defendant at the time of the incident, and her right of possession over it can be found to be superior to the defendant's right simply because she decided to withhold it from him and to maintain control over it.

"A conclusion here that a claim of right, for policy reasons, should no longer be recognized as a defense to robbery—even where the defendant can establish that he [was attempting to take] back specific property to which he has lawful title or a bona fide claim of ownership—would mean such a defendant could be convicted of robbery *based on [another's] theft of his own property*, a proposition that would stand in patent conflict with both the commonsense notion that someone cannot steal his own property, and the corollary rule that theft, the taking of the personal property of *another* . . . is a lesser included offense at the core of every robbery." (Citation omitted; emphasis in original; internal quotation marks omitted.) *People* v. *Tufunga*, 21 Cal. 4th 935, 948, 987 P.2d 168, 90 Cal. Rptr. 2d 143 (1999). In accordance with both common sense and our plain and unambiguous statutory criteria for the offense of larceny (and therefore also an attempt to commit robbery in the first degree), we conclude that the evidence presented to the jury was insufficient to establish that the complainant or any person other than the defendant was the "owner" of the $294 pursuant to §§ 53a-118 (a) (5) or 53a-118 (b).

IV

As previously noted, there is a lack of evidentiary support for the conclusion that the defendant intended to take *any* currency or property worth $294; see part III A of this opinion. The law of larceny distinguishes between (1) a claim of right in specific property that a defendant seeks to satisfy by retaking that specific property, and (2) a claim of right that arises from a debt that a defendant seeks to satisfy by taking any currency or property as payment for that debt. "A claim of right defense . . . must encompass (1) some form of *pre-existing ownership* or possession of (2) *specific* property." (Emphasis in original.) *State* v. *Stenger*, 122 Haw. 271, 285, 226 P.3d 441 (2010). "[S]elf-help by a person who claims that the victim of his or her taking owes that person money, and who intends to hold the debtor's property until the debt is paid, does not qualify as a claim made in good faith. This is different from the case of one who in good faith claims an ownership right in the subject matter of the taking, as opposed to its value." (Footnote omitted.) 50 Am. Jur. 2d, supra, § 42, p. 52.

Usually "[t]he distinction between specific personal property and money in general is important. A debtor can owe another $150, but the $150 in the debtor's

pocket is not the specific property of the creditor. One has the intention to steal when he takes money from another's possession against the possessor's consent even though he also intends to apply the stolen money to a debt. The efficacy of self-help by force to enforce a bona fide claim for money does not negate the intent to commit robbery. Can one break into a bank and take money so long as he does not take more than the balance in his savings or checking account? . . . A debt is a relationship and in respect to money seldom finds itself embedded in specific coins and currency of the realm. Consequently, taking money from a debtor by force to pay a debt is robbery. The creditor has no such right of appropriation and allocation." *Edwards* v. *State*, 49 Wis. 2d 105, 113–14, 181 N.W.2d 383 (1970).

Stated another way, usually "a person cannot have a true claim to bills or other currency, because they are fungible . . . . Generally, the law considers a defendant who believes that he is owed a sum of money, and then takes cash in that amount by force, to have committed robbery. On the other hand, a good faith belief that a chattel belongs to the taker would, if credited by the jury, negate the larcenous intent element of robbery . . . .

"The difference lies in whether defendant may have a good faith belief that the particular property belonged to him. When a defendant takes a hundred dollars from a debtor by force, without any evidence to suggest that defendant cares about the particular bills making up that hundred dollars, defendant cannot be said to have a good faith belief that the bills are his own. On the other hand, when a defendant takes a painting, or a car, or a television set, he may have an honest belief that it is his own property he is retrieving.

"Currency might be, in essence, chattel if its intrinsic qualities, as opposed to its monetary value, are significant to the defendant, for example if defendant takes what he mistakenly believes to be a Roman coin from his collection or what he incorrectly thinks is a bill he marked with a handwritten poem. One can also conceive of a situation in which cash acquires a chattel-like status, through the circumstances of the taking. A person who sees a burglar emerge from her home carrying what she believes to be bundles of cash she had left under her bed has a claim of right defense if she takes the cash back by force and it turns out that it was not hers." (Citations omitted.) *People* v. *Pagan*, 19 N.Y.3d 91, 97–98, 968 N.E.2d 960, 945 N.Y.S.2d 606 (2012).

The defendant in *People* v. *Pagan*, supra, 19 N.Y.3d 94–95, was charged with, inter alia, attempted robbery in the second degree after (1) she gave a $20 bill and a $1 bill to a taxicab driver to pay for a $4 fare; (2) he returned her $1 bill and gave her $16 in change; (3) she insisted that he owed her $17 instead; (4) he returned

her $20 bill upon her insistence; (5) she retained both the $20 bill and the $16 in change after he refused her payment of $4 from the $16 in change; (6) he asked her to return just the $16 in change; and (7) she assaulted him and threatened to use a knife on him after he picked up the $16 that she had set down near him. The court affirmed her conviction and noted in relevant part: "[T]here was no evidence that the particular bills making up the $16 had any significance for defendant, or that she could identify them as hers. Those bills were change that the cabdriver produced after defendant gave him $20." Id., 98. The court concluded: "[T]he jury could have rationally concluded that defendant had no good faith belief that the bills she tried to take were hers, but was instead trying to take money she knew was another's." Id., 98–99.

In contrast, there is no evidence in the present case that the defendant sought to retake anything other than the specific $294 that he had sent to the complainant in order to obtain a bail bond or a lawyer. Several of the witnesses, including the complainant, answered in the negative when asked if the defendant tried to take any other money or property from the complainant's person. This testimony is consistent with the testimony describing the scope of the defendant's assaultive conduct—he dragged her, grabbed her, and placed his knife on or near her body, but he did not search for or remove property on her person, nor did he forcibly take her to a place where she could obtain money other than the $294 he had sent to her or property worth $294. The evidence instead indicates that the defendant intended to take the complainant to her home so that he could retake the $294. Furthermore, the defendant referred to the money as money that he owned, i.e., "my money," not as money that he was owed, i.e., a debt.

As previously noted, "[e]ach essential element of the crime charged must be established by proof beyond a reasonable doubt, and although it is within the province of the jury to draw reasonable, logical inferences from the facts proven, they may not resort to speculation and conjecture." (Internal quotation marks omitted.) *State* v. *Smith*, 185 Conn. 63, 71, 441 A.2d 84 (1981). Yet, there was no basis other than speculation or conjecture for the jury to conclude that the state had established beyond a reasonable doubt the defendant's intent to take the complainant's property, as opposed to his property, given that the cumulative force of the evidence pertaining to intent focused on the specific $294 that the defendant had sent to the complainant. A fact finder may be able to draw a reasonable, logical inference from evidence, not from a lack thereof.

The issue of whether the defendant would have been satisfied if the complainant had given him any combination of bills totaling $294 or one or more items of property worth that amount on the night of the incident is

not addressed by the evidence. It is therefore outside the scope of the evidence and the claim presently before us. The state, not the defendant, bore the burden of presenting evidence to establish that the defendant's conduct amounted to a "robber[y] perpetrated to satisfy, settle or otherwise collect on a debt, liquidated or unliquidated," and not a "forcible [taking] intended to recover specific personal property in which the defendant in good faith believes he has a bona fide claim of ownership or title . . . ." *People* v. *Tufunga*, supra, 21 Cal. 4th 956. Its failure to do so renders the evidence insufficient to establish the intent element of larceny and therefore attempt to commit robbery in the first degree.

V

A pair of cases from other jurisdictions illustrates and discusses the required larceny predicate to proof of robbery.[11] In *People* v. *Tufunga*, supra, 21 Cal. 4th 939–42, the defendant was charged with and found guilty of, inter alia, residential robbery after a domestic dispute during which he used force to take $200 from the victim, his former wife. The defendant and the victim gave conflicting testimony regarding the factual basis of the charge. Id. The victim testified that her mother had given her the money, which she placed on her coffee table and which the defendant took after he assaulted her. Id., 940. In contrast, the defendant testified that he had given the money to the victim in order to help her pay a bill. Id., 941. He placed the money on the coffee table during his visit to the victim's house, but during their dispute, the victim picked up the money and put it in her bra. Id., 942. The defendant believed that the victim intended to give the money to her mother rather than use it to pay her bill, and he demanded that she return it to him. Id. When she refused to do so, he reached into her bra, took the money, and walked out the front door of the victim's house. Id.

"At trial, the defense requested instruction on a claim-of-right defense to the charge of robbery. The trial court concluded the facts would not support the defense and refused to instruct on it. On appeal, defendant urged that even if he had used force to take back his $200, that fact is immaterial to the existence of his bona fide belief in his right to take back the money he conditionally gave to [the victim], once he concluded in good faith that she was not going to use it to pay bills and would instead turn it over to her mother. The People responded that defendant furnished no substantial evidence of a bona fide belief in his right to reclaim the money. Although the source of the money present in the apartment during the incident was therefore disputed at trial . . . it was not disputed that the same $200 in currency was at the heart of the controversy. In other words, if defendant's version of the incident was believed, there was no further evidence or claim by the

People that [the victim] had commingled the specific currency he gave her with her own funds before he grabbed it back and fled from her apartment." Id., 942–43.

The court in *Tufunga* held that the evidence was sufficient to warrant a claim-of-right defense instruction and noted: "[I]f defendant's version of the events was believed, even his self-admitted use of force did not preclude his raising a claim-of-right defense to the robbery charge, given his further testimony that he brought $200 into the victim's home and took back the same currency upon fleeing." Id., 944–45. After a thorough examination of the legislative history underlying California's larceny and robbery statutes, the court also determined that "a claim-of-right defense can negate the *animus furandi* element of robbery where the defendant is seeking to regain specific property in which he in good faith believes he has a bona fide claim of ownership or title." (Emphasis in original.) Id., 950. It deemed the defense to be unavailable to defendants who commit robberies simply to collect on debts, however, because a forcible taking of any property in which a defendant has no recognized interest, so long as it satisfies a claimed debt, is a larcenous exercise in violent self-help, not a reclamation of that defendant's own property. Id., 950–56.

In *People* v. *Falkner*, 61 Ill. App. 3d 84, 85, 377 N.E.2d 824 (1978), the defendant was charged with felony murder after he shot a fellow bar patron during an armed robbery. The incident characterized as the armed robbery was a dispute between the defendant and a bartender where the defendant threatened the bartender with a gun because he believed that the bartender had not provided him with the correct change for the $50 bill that he used to pay for his drinks. Id., 87–88. The bartender gave more money to the defendant in response to the defendant's threat, and as the defendant tried to leave the bar, he encountered the victim and other bar patrons, resulting in the struggle in which the defendant shot the victim. Id., 88. The defendant claimed on appeal that "his taking of money from [the bartender] at gunpoint was not done with the intent to rob him but rather was a reckless attempt to stop [the bartender] from interfering with defendant's own property by shortchanging him. He assert[ed] the requisite intent element of armed robbery was not present and, therefore, neither was the underlying forcible felony element of the felony murder charge." Id., 87.

The court in *Falkner* agreed with the defendant: "In the instant case defendant was in a place where he was known and carrying a substantial sum of his own money when the alleged armed robbery occurred. While the evidence was conflicting as to whether defendant gave the bartender a $50 or a $20 bill in payment for the drinks, a conclusion by the fact-finder that it was only

a twenty would not establish defendant intended to rob the bartender. It would be equally probable to conclude defendant was confused or mistaken as to the denomination of the bill and intended only to recover his correct change as he and other witnesses testified. A factual determination of the denomination of the bill, alone, cannot in these circumstances establish defendant's intent. All the witnesses testified that defendant initially asked for his own money. Those persons who heard him ask for money a second time differed as to whether he then demanded 'all the money' or 'all my money.' Even if defendant in fact requested 'all the money' on the second occasion this could have referred to all the money that was rightfully his if he thought he still had not received proper change. There was evidence that on a prior occasion in the same place defendant claimed to have given a $50 bill to a person collecting cover charge when he had in reality only given a twenty. While such evidence might suggest that defendant practiced a scheme to defraud persons changing bills for him, it also might be said that such evidence showed that on another occasion when defendant realized he had made an error he peacefully accepted it and left. The evidence here leaves us with a grave doubt as to defendant's intent to commit armed robbery and, therefore, we must find that the necessary armed robbery element of the felony murder charge was not proved beyond a reasonable doubt." Id., 90.

There is an element of immediacy in *Tufunga* and *Falkner* that is absent from the present case, insofar that an undefined amount of time passed between when the defendant sent the $294 to the complainant and when he sought to retake it from her. The present case is also distinguishable from *Tufunga* and *Falkner*, however, because the evidence does not present any factual disputes regarding the defendant's ownership interest in the property that he sought to retake, whereas the evidence in *Tufunga* and *Falkner* presented many such disputes, none of which precluded either court from holding that the defendant's claim of right in the stolen property negated the intent element of larceny and therefore robbery.

The evidence in this case, as acknowledged by the state, is insufficient to establish the defendant's intent to commit larceny, and therefore, we conclude that the necessary intent element of the attempt to commit robbery in the first degree charge was not proved beyond a reasonable doubt.

## VI

The "defendant's actions in seeking to recover from the victim, albeit with force, what he believed in good faith was his *specific property*, no matter how reprehensible and otherwise unlawful those actions may have been, did not constitute a felonious taking necessary for conviction of robbery." (Emphasis in original.) *People* v.

*Tufunga*, supra, 21 Cal. 4th 956. They nonetheless may have been the basis for other charges. "In many if not most such cases . . . the defendant likely will have committed various separately chargeable assaultive crimes through utilization of the force or fear necessary to support the charge of robbery." Id., 949.

As defense counsel contended during oral argument before this court: "[T]he substitute information—they picked the wrong crimes. There was no robbery here because the robbery statute requires a larceny and the elements fell short on that. Initially, [the defendant] was charged . . . with assault and unlawful restraint. We're not condoning violence. We're not asking this court to condone violence. We're not asking this court to condone vigilantism or taking your issues into the street, if you will. What we are saying is that the elements were not met. . . . We're not saying he didn't commit a crime. . . . We're not saying that it's okay to be violent. We're just saying that the state didn't prove the crime that they charged." The defendant was arrested and charged initially pursuant to an information dated December 2, 2009, with (1) assault in the third degree in violation of § 53a-61, (2) unlawful restraint in the first degree in violation of § 53a-95, (3) reckless endangerment in the second degree in violation of § 53a-64, (4) threatening in the second degree in violation of § 53a-62, and (5) breach of the peace in the second degree in violation of § 53a-181. None of these charges referenced larceny or robbery.

Our sufficiency of the evidence analysis is limited to the crime with which the defendant was charged and convicted, attempt to commit robbery in the first degree in violation of §§ 53a-49 and 53a-134. For the foregoing reasons, we agree with the defendant that the evidence was insufficient to establish beyond a reasonable doubt that he intended to take the property of another, and this is an essential element of larceny and therefore attempt to commit robbery in the first degree.

The judgment is reversed and the case is remanded with direction to render judgment of acquittal on the charge of attempt to commit robbery in the first degree in violation of §§ 53a-49 (a) (2) and 53a-134 (a) (3).

In this opinion LAVINE, J., concurred.

[1] The complainant testified that the defendant spoke to her brother and her friend before he spoke to her.

[2] The complainant testified that she had an unspecified amount of money on her person, none of which belonged to the defendant, during the incident.

[3] Defense counsel stated during oral argument that the complainant may have repaid the defendant with some of the $294 he sent to her.

[4] The defendant does not challenge the propriety of the court's jury instructions in either of his two claims on appeal. Therefore, we address the court's jury instructions only to the extent that they are relevant to the defendant's insufficient evidence claim.

[5] We sua sponte ordered the parties to submit supplemental briefs on the following question: "Did the trial court properly deny the defendant's motion for judgment of acquittal on the basis of *State* v. *Woolfolk*, 8 Conn. App. 667, 517 A.2d 252 (1986), cert. denied, 202 Conn. 802, 519 A.2d 1207 (1987), and the defense of justification, rather than on the basis of [General Statutes

§] 53a-118 (a) (5) and (b) concerning ownership and the superior right of possession?"

[6] As discussed in part III C of this opinion, the state has argued that in this case proof of all of the elements of larceny is not necessary because of the violent acts of the defendant against the complainant, but given the absence of any legislative action providing for such an exception, as well as the lack of ambiguity in the language and organization of the relevant statutes, we do not believe that the state's argument is viable.

[7] The legality of the defendant's ownership of the $294 was not at issue during the trial, and it is not at issue in the present appeal.

[8] In *State* v. *Woolfolk*, supra, 8 Conn. App. 668, the defendant was charged with and convicted of, inter alia, robbery in the first degree after he pointed a gun at and took money from the victims. The defendant claimed on appeal that the trial court erred in denying his request to charge the jury on a justification defense under § 53a-21. Id., 669. The defense essentially provided that the defendant was justified in using reasonable physical force to take the money from the victims because they had taken money from him the previous night by cheating during a dice game. Id., 669–70. Even though in this case the court and the parties addressed and relied upon *Woolfolk* many times during and after trial, we believe that *Woolfolk* is factually and legally distinguishable from the present case in its present procedural posture. This is because (1) the defendant in *Woolfolk* "snatched whatever money [one of the victims] had in his hand"; (internal quotation marks omitted) id., 672C; whereas the evidence in the present case indicates that the defendant sought to retake the specific $294 that he had sent to the complainant, and (2) the defendant in *Woolfolk* claimed on appeal that the trial court erred by denying his request to charge on a statutory justification defense, whereas the defendant in the present case claims that the trial court erred with respect to denying his motions for a judgment of acquittal on the ground of insufficient evidence.

[9] "On the other hand, pursuant to a statute governing claim of right, to inject the issue of a claim-of-right defense, a defendant has the burden of adducing evidence that would demonstrate that she had an honest belief that she had a right to take the property that was allegedly stolen." 50 Am. Jur. 2d, supra, § 121, p. 131; see, e.g., *State* v. *January*, 176 S.W.3d 187, 197 (Mo. App. 2005).

[10] We emphasize that the focus of the defendant's claim on appeal is that he lacked the requisite intent for larceny because he believed in good faith that he owned the specific bills constituting the $294 being held by the complainant. Our analysis of the "wrongful taking" and "ownership of another" elements of larceny accordingly are shaped by the defendant's focus on his claimed lack of wrongful intent. We nonetheless note that the state's concession and the absence of evidence regarding the complainant's ownership interest or superior possessory interest in the $294 indicate that the state failed to meet its burden not only with respect to the "intent" element of larceny but also with respect to the separate and distinct "ownership of another" element of larceny.

[11] "In the absence of state decisional guidance, we look to the reasoning of other jurisdictions that have confronted analogous circumstances." *Connecticut Carpenters Benefit Funds* v. *Burkhard Hotel Partners II, LLC*, 83 Conn. App. 352, 357, 849 A.2d 922 (2004).